kaw

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BARRON R. BOWLING,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | )   **Case No. 04-2320-JAR** |
| **UNITED STATES, et. al,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM AND ORDER

Plaintiff Barron R. Bowling brought this action against Defendants Timothy McCue,

Brendan Fitzpatrick, Brandon Collins, the United States,[1] the Unified Government of Wyandotte

County, Kansas City, Kansas ("Unified Government"), Ronald Miller, Steven Culp, Dennis

Ware, and Robert Lane.  Plaintiff asserts claims under 42 U.S.C. § 1983 against Defendants

Ware, Culp, and Lane in their individual capacities, to wit: (1) malicious prosecution in violation

of Plaintiff's Fourth Amendment right to be free from unreasonable seizures, in violation of

Plaintiff's Sixth Amendment right to a fair trial, and in violation of Plaintiff's Fourteenth

Amendment right to substantive and procedural due process; (2) abuse of process in violation of

plaintiff's Fourth Amendment right to be secure in his person against unreasonable seizures, in

violation of Plaintiff's Sixth Amendment right to a fair trial, and in violation of Plaintiff's

Fourteenth Amendment right to substantive and procedural due process; and (3) conspiracy to

violate Plaintiff's rights in violation of his Fourth, Sixth, and Fourteenth Amendment rights.

Plaintiff brings a supervisory liability claim under 42 U.S.C. § 1983 against Defendant Miller

---

[1]All claims against Defendants Fitzpatrick, Collins, and McCue have been dismissed.  The United States has not filed a motion for summary judgment on Plaintiff's claim under the Federal Tort Claims Act; accordingly, that claim proceeds to trial.

and a *Monell* claim against the Unified Government.  Plaintiff also asserts state law claims for malicious prosecution and abuse of process against the Unified Government, Miller, Culp, Ware, and Lane.

Before the Court is the Motion for Summary Judgment (Doc. 192) by Defendants Unified Government, Miller, Culp, Ware and Lane.  For the reasons stated in further detail below, Defendants' motion is granted in part and denied in part.

## I.      FACTS

The following facts are uncontroverted, stipulated to, or taken in the light most favorable to Plaintiff.  On July 10, 2003, Plaintiff Barron R. Bowling was driving his car northbound on Tenth Street in Kansas City, Kansas ("KCK").  Defendant Timothy McCue, a Special Agent of the Drug Enforcement Administration ("DEA"), was driving an unmarked government vehicle, a Chevrolet with dark tinted windows.  McCue was also driving northbound on Tenth Street, immediately behind Plaintiff.   Plaintiff stopped at the stop sign at the intersection of Tenth and Montana Streets.  At this intersection, Tenth Street widens to accommodate a bus lane. Tenth Street again narrows to one northbound lane within the next block, that is, before Tenth Street intersects with Ray Street, which is one block north of Montana.

Plaintiff noticed the Chevrolet, positioned  behind him to the right, just south of the intersection of Tenth and Ray Streets.  At this point, Tenth Street had narrowed; there was no more bus lane, only sufficient space to accommodate cars parked along the curb.  Plaintiff accelerated to prevent the Chevrolet from illegally passing him on the right side.  Plaintiff claims that he believed that accelerating was his best option to avoid either colliding with the Monte Carlo or crossing over into the southbound lane of traffic.  Nonetheless, Plaintiff's car and the

Chevrolet driven by McCue collided on Tenth Street, just south of the intersection of Ray Street.

Agent McCue activated his siren and effected a traffic stop of Plaintiff's car on the east side of Tenth Street.  Agent McCue exited his vehicle and approached Plaintiff's car from the south, with his weapon drawn.  By this time, DEA Agents Brendan Fitzpatrick, Todd Dolato and Brandon Collins were at the scene; along with Agent McCue, they had been in the area, in separate vehicles, conducting joint surveillance of suspected drug activity.   At this point, none of them identified himself to Plaintiff as a DEA agent.  The DEA agents pulled Plaintiff from the car.  According to Plaintiff, as well as some eyewitnesses, the agents kicked, punched, and beat Plaintiff with a gun, shouted profanity and threatened him with bodily harm.  One or more of the witnesses heard McCue shout "I'm going to kill you, you son of a bitch."

The DEA agents handcuffed Plaintiff, and made him lie on the street chest down. Plaintiff was shirtless at the time.  While Plaintiff was in handcuffs, the agents kicked, punched, and beat him until he lost consciousness.  After Plaintiff regained consciousness, the agents made him sit on the curb.

Sometime before KCK police officers arrived on the scene, Agent McCue called 911. McCue told the 911 operator that he had been in an accident on Tenth Street, just north of Montana; McCue further told the operator that he had been rammed by another car just after Ray Street.  McCue also called Officer Robert Lane, a KCK police officer.  Lane was the first KCK police officer to arrive on the scene.  When Lane arrived, McCue told Lane that his vehicle had been rammed by Plaintiff's car after McCue had tried to pass Plaintiff's car on the right side.

According to Plaintiff, Lane spoke with Plaintiff there at the scene, and assured Plaintiff

that he was not under arrest and was not going to jail, because it was merely an accident.[2]  Lane

asked Plaintiff what he intended to do about the situation.  When Plaintiff responded that he

wanted to go home and have his wife take him to the hospital and call his attorney, Lane left

Plaintiff and went to converse with the DEA agents at the scene.  Plaintiff heard the agents laugh

while conversing with Lane. At that point, Lane returned to Plaintiff and told him that he was

going to be arrested.  Lane also told Plaintiff he was in a "clusterf***" because the DEA agents

"do pretty much whatever they want to do."

Plaintiff was placed under arrest.  Before KCK officers placed him in the squad car,

Plaintiff volunteered a marijuana pipe he had on his person.  Plaintiff was arrested and taken to

Wyandotte County Jail where he stayed for two days.

While at the scene, Lane called Plaintiff's wife, Elisa Bowling and asked her to come and

pick up Plaintiff's car.  Lane initially told Mrs. Bowling that Plaintiff was in an accident with

DEA agents but he was not going to jail.  Later, Lane told Mrs. Bowling that Plaintiff was

getting "screwed" because the DEA agents thought that they could do whatever they wanted.  A

couple of days after the incident, and before Plaintiff was released from jail, Mrs. Bowling called

Lane seeking assistance in obtaining information about her husband's case.  In this conversation,

Lane told Mrs. Bowling that although Plaintiff was not charged with any crime, he was being

held in custody so that the DEA agents could have more time to get their "stories straight."

While at the scene,  Lane also spoke with the witnesses.  Although none of the witnesses

saw the collision, they all stated that the agents had beaten Plaintiff.

Eventually, Officer Shumaker arrived at the scene.  Shumaker testified that he observed

_____

[2]Plaintiff recalls that another agent at the scene also told him that it was just an accident.

4

that Plaintiff was injured, and that Plaintiff told him the agents beat him.  Shumaker testified that

it was his practice to tell the investigating officer everything he learned from a witness.  Officer

Lane was the investigating officer at the scene.  Shumaker testified that Lane directed Shumaker

to write a police report and Lane told Shumaker what evidence to document in the report, and

what charges to refer to in the report.  Shumaker's report stated that Plaintiff rammed McCue's

vehicle while McCue was passing on the right.  Shumaker's report failed to mention Shumaker's

observation that Plaintiff was injured.  Shumaker's report mentioned that witnesses were present,

but did not report what the witnesses said, because Lane had concluded that the witnesses had

some animosity towards police officers. Neither Lane nor Shumaker took photographs of

Plaintiff's injuries.

　　　　　Shortly after the incident, Deputy Chief of Police Steven Culp was informed that a DEA

agent was filing an aggravated assault charge against Plaintiff.  Culp talked with Major Dennis

Ware about the investigation and Ware told Culp that Detective Max Seifert was assigned the

case.  Ware told Culp that Plaintiff was in custody for intentionally running a DEA agent off the

road.  Culp told Ware to watch the case closely because Detective Seifert had had negative

interactions with  federal authorities in the past.

　　　　At the point that Seifert was assigned the case, Plaintiff was still in jail, so Seifert and his

partner Mike Lucas interviewed Plaintiff in the jail.  Plaintiff told Seifert that he was driving

northbound on Tenth Street and noticed the Chevrolet behind him on the right side, while he was

stopped at the Montana intersection.  Plaintiff told Seifert that he thought the driver was an

illegal alien, and that he decided that he was not going to let the person pass him on the right

because he was not in a good mood that day.  Plaintiff stated that when the vehicle tried to speed

up and cut him off, Plaintiff accelerated to prevent the vehicle from passing; and his car and the vehicle collided because the lane narrowed.  Plaintiff also told Seifert that he was under the impression that Officer Lane would assist him, because Lane had given Plaintiff his business card.

After leaving the interview, Seifert spoke with his supervisor, Captain Moss, and advised that he thought the case should be referred to the police department's internal investigations unit because there were allegations of police misconduct, and that he (Seifert) was not the right person to investigate the case.  Captain Moss contacted Major Ware, who joined Moss and Seifert's meeting.  Seifert repeated his thoughts to Ware; and also mentioned that he suspected something was wrong because until he spoke with Plaintiff, he was unaware that Officer Lane was involved in the investigation.  Seifert further told Moss and Ware that the officers involved in the arrest did not file a report detailing what occurred at the scene, and that Seifert had not seen any report from Lane.  The meeting concluded with Moss directing Seifert to contact Lane to get the reports.

Seifert contacted Lane and requested reports from all the officers at the scene.  Lane advised that he would get the reports to Seifert.  Seifert asked Lane why he did not take statements from the witnesses.  Lane responded that it would look bad for the DEA agents.  Lane told Seifert that because the DEA agents were a tremendous help to the KCK Police Department, they should "cover for them."  After learning the circumstances surrounding the incident, Seifert faxed a "blue sheet" to the jail to release Plaintiff pending further investigation.

Seifert again contacted Ware; and Ware directed Seifert to interview the witnesses.  Seifert interviewed the witnesses, who confirmed that although they did not see the collision, they saw the agents beating Plaintiff.  After Seifert interviewed the witnesses, Ware and Culp

6

contacted Seifert.  Seifert presented the witness statements to Ware; and Ware responded by asking Seifert if he was an internal affairs investigator.

Sometime the following week, Officer Lane, Agent McCue, and Agent Fitzpatrick submitted their statements to Seifert.  Lane's statement did not include an account of the statements the witnesses had made to Lane.  Lane's statement did include an account of certain statements the Plaintiff purportedly made to Lane.  Lane wrote in his report that Plaintiff repeatedly stated that he "f***-up" and that [Plaintiff] thought it was a "wetback beaner" trying to pass him on the right and he was going to "f***" with him.  Plaintiff testified that Lane's statement is false; Plaintiff did not make these statements.

At some point, Culp and Shawn Johnson, the Special Agent in Charge of the DEA office, contacted Ware to talk about the case.  Culp testified that he talked with Johnson about the case while they played golf on the weekend, and that Johnson requested information about the case.  After talking with Johnson, Culp went to Seifert's office and briefly looked through the files.  Culp told Ware and Seifert that federal agents would be coming by to retrieve some information from the files.

During the investigation, Chief of Police Ron Miller had no first hand knowledge about the case.  Miller did not discuss the case with either Culp or Ware, but the two provided Miller with regular updates on the case.

After gathering the information, Seifert compiled his investigative file, which included: a property damage report; Shumaker's report; the offense report; Plaintiff's statement; the statements of two witnesses; a narrative of Seifert's investigation; and the statements of Officer Lane, Agent McCue, Agent Fitzpatrick, and Agent Dolato.  Seifert sent his file to the District Attorney's office.  The prosecutor initially declined to prosecute the case, stating there was

7

insufficient evidence to prosecute Plaintiff for "intending to do or threaten to do bodily harm to the agents," and that it was unlikely a jury would convict Plaintiff of criminal damage to property, because of the circumstances surrounding the accident.

After the District Attorney declined prosecution, Culp spoke with the prosecutor assigned to the case, advised that the DEA had additional information about the case, and urged reconsideration of the declination of prosecution. On August 12, 2003, additional information was submitted to the district attorney, accident reports from the DEA agents as well as the statements of Agents McCue, Fitzpatrick, Collins, and Dolato.

The District Attorney decided to prosecute, and Plaintiff was charged with possession of drug paraphernalia and criminal damage to property, a felony crime. On August 15, 2003, an affidavit for a complaint and warrant was presented to a Wyandotte County District Judge. The affidavit stated:

> The investigation by law enforcement officers disclosed that on the date of 07-10-03 at 1625 hours; at the location of 299 S. 10th Street, Kansas City, Kansas; this location being within the geographic boundaries of the State of Kansas, Wyandotte County, within the city limits of Kansas City, Kansas, 29th Kansas Judicial District, an incident occurred involving one Barron R. Bowling, who was alleged to have willfully, willingly and knowingly criminally damaged a motor vehicle belonging to the United States Government; this being a 2002 Chevrolet Monte Carlo, being operated by one Timothy McCue, who is an agent for the Drug Enforcement Agency of the United States Government. This vehicle belonging to the United States Government, being operated by Timothy McCue, who is on duty for the United States Government on the aforementioned date and time. (sic) It is alleged that Mr. Bowling did drive his Lincoln Town Car into the left side of the motor vehicle being operated by Timothy McCue, therefore causing damage. It is further alleged that this was done in a reckless manner by Barron R. Bowling, who upon being taken into custody and placed under arrest, was found to have on his possession a pipe used for the smoking of illegal narcotics/marijuana, according to Barron Bowling's own words. It

> is further noted that these allegations are made by Timothy McCue
> against Barron R. Bowling, with Agent McCue stating that the
> crimes were committed in a wilful and wanton manner and that it
> is his wish and the wish of the Government of the United States to
> criminally prosecute Barron R. Bowling in regards to what has
> taken place.  It should be noted that the damage to the 2002
> Chevrolet Monte Carlo belonging to the United States Government
> is in excess of over (sic) $500.

Based on the affidavit, a warrant was issued, and Plaintiff was arrested on September 30,

2003.  Plaintiff was booked into the Wyandotte County Detention Center, and he remained in

custody for one day before he was released on a $5000 surety bond for which he paid a $500 fee

to the bondsman.

At the preliminary hearing, the judge, relying solely on McCue's statements, found that

there was probable cause to believe that Plaintiff intentionally damaged McCue's vehicle.

Plaintiff was subsequently convicted of possession of drug paraphernalia and acquitted of

criminal damage to property.  Plaintiff subsequently filed this action.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."[3]  A fact is only material under this standard if a dispute over it would affect the outcome

of the suit.[4]  An issue is only genuine if it "is such that a reasonable jury could return a verdict

for the nonmoving party."[5]  The inquiry essentially determines if there is a need for trial, or

---

[3]Fed. R. Civ. P. 56(c).

[4]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5]*Id.*

whether the evidence "is so one-sided that one party must prevail as a matter of law."[6]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[7] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[8] The burden may be met by showing that there is no evidence to support the nonmoving party's case.[9] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10] When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[11] Furthermore, the record is to be viewed in the light most favorable to the nonmoving party.[12] Therefore, the Court will assume the nonmoving party's evidence to be true, determine all doubts in the nonmovant's favor, and draw all reasonable inferences in the nonmovant's favor

## III.   DISCUSSION

Defendants Culp, Ware and Lane claim that they are entitled to qualified immunity on the claims against them in their individual capacity. Defendants argue that Plaintiff is unable to

---

[6]*Id.* at 251–52.

[7]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[8]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[9]*Id.*

[10]*Id.*

[11]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[12]*Harrison v. Wahatoyas*, LLC, 253 F.3d 552, 557 (10th Cir. 2001).

show that they acted without probable cause to believe that Plaintiff committed criminal damage to property, and that even disregarding Lane's alleged false statements and fabrication of evidence, there was still probable cause to believe that Plaintiff committed criminal damage to property.  Defendants further argue that because Plaintiff was acquitted of criminal damage to property, his Sixth Amendment right to a fair trial was not violated.  Defendants also contend that Plaintiff cannot show that Defendants used the judicial process for an improper purpose, a necessary element of Plaintiff's federal and state abuse of process claims.  Additionally, Defendants argue that Plaintiff cannot point to evidence to support his § 1983 conspiracy claim, or his supervisor liability or *Monell* claims.

       "The doctrine of qualified immunity protects government officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[13]  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[14]  The doctrine "is designed not only to shield public officials from liability, but also to ensure that erroneous suits do not even go to trial."[15]  A "plaintiff must show 'that the public official's alleged conduct violated the law,'" and "that the law was clearly established when the alleged violation occurred."[16]  When conducting

---

[13]*Pearson v. Callahan*, —U.S.—, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[14]*Id.*

[15]*Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 780 (10th Cir. 1993).

[16]*Id.* (quoting *Pueblo Neighborhoods Health Ctrs. v. Lasavio*, 847 F.2d 642, 646 (10th Cir. 1988)).

this analysis, the district court has "discretion in deciding which of the two prongs of the

qualified immunity analysis [] should be addressed first . . . ."[17]  If plaintiff can show both a

constitutional violation and that the law was clearly established, then the usual summary

judgment burden is applicable and the movant will be entitled to judgment as a matter of law if

there are no genuine issues of material fact.[18]  In other words, "liability may not be imposed

unless [the public official's] conduct violates 'clearly established statutory or constitutional

rights of which a reasonable person would have known.'"[19]  To determine whether both parties

have carried their burden, the court views the evidence in the nonmovant's favor.

A.    Malicious Prosecution[20]

Defendants Culp, Ware and Lane claim they are entitled to qualified immunity on

Plaintiff's § 1983 claims that are based on malicious prosecution and abuse of process.  In the

Tenth Circuit, a malicious prosecution claim analysis under § 1983 begins with the state

---

[17]*Pearson*, 129 S. Ct. at 815.

[18]*Hinton*, 997 F.2d at 780.

[19]*Jantz*, 976 F.2d at 627.

[20]Although Plaintiff's Complaint asserts claims for false arrest and malicious prosecution, the Pretrial Order includes only a claim for malicious prosecution for the charge of criminal damage to property.  As the Fourth Amendment is relevant in false arrest claims and claims for malicious prosecution, the distinguishing factor is detention "'after the institution of legal process.'"  *Wilkes v. DeReyes*, 528 F3d. 790, 798 (10th Cir. 2008) (quoting *Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008)).  When a person is arrested pursuant to a warrant, a party can challenge the affidavit on which the warrant is based; namely, arguing that the affidavit relied on false, misleading, or omitted information.  *Id*. at 798-99.  In this case, Plaintiff was arrested at the scene of the accident and again after the issuance of an arrest warrant.  An arrest warrant is "a classic example of the institution of legal process."  *Id*. at 799.  Accordingly, because the Pretrial Order does not address a false arrest claim or because the false arrest claim rested on McCue's, Fitzpatrick's, and Collins' actions, it has been dismissed.  In any event, the officers had probable cause to arrest Plaintiff because he voluntarily turned over a pipe he used to smoke marijuana; and Plaintiff was convicted of possession of drug paraphernalia.  *Goukos v. Griffith*, 122 F. App'x 965, 972 (10th Cir. 2005).  The Court should also note that even though Defendants do not argue that Plaintiff's malicious prosecution claim fails because he was convicted on one charge at trial, a malicious prosecution claim may rest on the charge for which Plaintiff was acquitted.  *See Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007); *Johnson v. Knorr*, 477 F.3d 75, 85 (3d Cir. 2007).

elements of the tort and continues into an analysis of the underlying constitutional deprivation.[21]
In Kansas, a plaintiff bringing a malicious prosecution claim must prove: "(1) the defendant
initiated, continued, or procured the proceeding of which the complaint is made; (2) the
defendant in so doing acted without probable cause; (3) the defendant acted with malice; (4) the
proceedings terminated in favor of plaintiff; and (5) plaintiff sustained damages."[22]  In addition
to proving the state law elements, the plaintiff must also show that the acts of the defendant were
so egregious that he was deprived of his constitutional right under the Fourth Amendment to be
free from seizures.[23]  In *Becker v. Kroll*, the Tenth Circuit explained that "the Fourth
Amendment protects a person's liberty interests under the constitution by ensuring that any
arrest or physical incarceration attendant to a criminal prosecution is reasonable."[24]

      Defendants Culp, Ware, and Lane attack the second prong of Plaintiff's malicious
prosecution claim, arguing that officers had probable cause to believe that Plaintiff committed
the crime of criminal damage to property.  Probable cause exists if there are "'reasonable
grounds for suspicion, supported by circumstances sufficiently strong in themselves to warrant a
cautious or prudent person in the belief that the party committed the act of which he or she is
complaining.'"[25]  The inquiry into whether there was probable cause is "limited to the facts and
circumstances as they appeared to the defendant[s] at the time the prosecution was

---

[21]*Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996).

[22]*Good v. Bd. County Comm'rs of County of Shawnee, Kan.*, 331 F. Supp. 2d 1315, 1328 (D. Kan. 2004)
(citing *Lindenman v. Umscheid*, 875 P.2d 964, 974 (Kan. 1994)).

[23]*Willaims v. Weber*, 905 F. Supp. 1502, 1511 (D. Kan. 1995).

[24]494 F.3d 904, 919 (10th Cir. 2007).  Defendants do not contest that Plaintiff was seized within the
meaning of the Fourth Amendment.

[25]*Id.* at 1067 (quoting *Lindenman*, 875 P.2d at 974).

commenced."[26]  "Probable cause to arrest exists where an officer's information is derived from a

putative victim of a crime "'who it seems reasonable to believe is telling the truth.'"[27]  The

dismissal of the criminal proceeding is not enough to show that there was no probable cause for

the prosecution in the first place.[28]  In civil rights cases involving a claim of prosecution without

probable cause, a court must put aside allegedly false information, supply any omitted

information, and determine whether the contents of the corrected affidavit would have supported

a finding of probable cause; if at the conclusion of the analysis probable cause remains, no

constitutional violation of arrestee's Fourth Amendment rights has occurred.[29]  Additionally, if

there are material facts as to whether there was probable cause, the court cannot decide probable

cause as a matter of law.[30]

      Plaintiff was charged with, and acquitted of, criminal damage to property.[31]   Under

Kansas law, criminal damage to property is intentionally damaging or substantially impairing the

use of any property of another without consent.  Defendants contend that there was probable

cause to believe that Plaintiff acted intentionally in colliding with Agent McCue's vehicle.[32]

Plaintiff counters that the agents' statements and Lane's statement concerning the incident

---

[26]*Smith v. St. Paul Fire & Marine Ins. Co.*, 905 F. Supp. 909, 917 (D. Kan. 1995).

[27]*Gill v. County of Suffolk*, – F. Supp. 2d –, 2008 WL 4866036, at *4 (E.D.N.Y. Nov. 9, 2008); *see also Cortez v. McCauley*, 478 F.3d 1108, 1141 (10th Cir. 2007).

[28]*Stegall v. Great Am. Ins. Co.*, 996 F. Supp. 1060, 1068 (D. Kan. 1998).

[29]*See Wilkes v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008); *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996); *Weinstock v. Wilk*, 296 F. Supp. 2d 241 (D. Conn. 2003).

[30]*Kitchens v. Bryan County Nat'l Bank*, 825 F.2d 248, 252 (10th Cir. 1987).

[31]K.S.A. § 21-370. Criminal damage to property is a severity level 9, nonperson felony if the property is damaged more than $1,000 but less than $25,000.

[32]Defendants argue only that there was probable cause to charge Plaintiff with criminal damage to property and do not contest any other element on Plaintiff's malicious prosecution claim.

contain false statement, attributing to Plaintiff statements that Plaintiff did not make.  Namely, Plaintiff did not tell officers that he "f***-up" or that he thought it was a "wetback" trying to pass him.  At the same time, it is uncontroverted that Plaintiff told Detective Seifert that he thought the driver of McCue's vehicle was an illegal alien and that he accelerated because he did not want the vehicle  to pass him illegally.  But viewing the facts in the light most favorable to Plaintiff, there was not probable cause to believe that Plaintiff intentionally rammed his car into McCue's vehicle.

Defendants wrongly rely on the fact that a judicial officer made a determination of probable cause in issuing the charge and arrest warrant; and again found probable cause after conducting a preliminary hearing.  For Plaintiff does not attack the facial validity of the affidavit; nor the facial sufficiency of the evidence presented at the preliminary hearing.  Rather, Plaintiff argues that the affidavit was based on the false assertion of Agent McCue that Plaintiff intentionally rammed his car into McCue's vehicle; and this was the only evidence presented at the preliminary hearing as well.  Defendants are correct that probable cause does not require proof beyond a reasonable doubt, nor is it necessary to present all evidence to the judicial officer. But the issue in this case is not the weight of the evidence provided in support of probable cause, but the validity of the evidence provided in support of probable cause and the defendants' knowledge of the invalidity of the evidence. Notably, even with the alleged false information relied on to bolster a case against Plaintiff, the district attorney initially declined prosecution. There is little doubt the district attorney would have declined the prosecution of this case based on the facts as Plaintiff alleges. Under these circumstances, a judicial determination of probable cause, based on information officers allegedly knew to be false or materially incomplete, is not

determinative of probable cause.[33]

Here, the gravamen of Plaintiff's claim is that Defendants presented an affidavit as well as testimony, based solely on the false statements of Agent McCue.  In analyzing whether Defendants acted with probable cause, the Court necessarily considers the facts and circumstances as they appeared to Defendants at the time prosecution was commenced, disregarding allegedly false information, while factoring in any material information that was omitted from the affidavit or testimony.   Thus, the Court disregards the statements that were allegedly falsely attributed to Plaintiff, while considering the statements Plaintiff acknowledges, that he sped up to prevent McCue's vehicle from passing him on the right side.   This statement would indicate that Plaintiff's car was in the traffic lane, and that McCue's vehicle collided with Plaintiff's vehicle when McCue attempted to cut in front of Plaintiff's car.    The Court disregards Agent McCue's allegedly false, as well as conclusory statement that Plaintiff intentionally rammed his car into McCue's vehicle.

At the same time, the Court factors in other material information that was omitted from the affidavit or testimony.  This information includes: (1) Officer Lane assuring Plaintiff that it was an accident, but later telling Plaintiff that Plaintiff "was screwed," because the DEA agents could do whatever they wanted; (2) eyewitnesses and Plaintiff telling Officer Lane that the DEA agents had beaten Plaintiff; (3) Officer Shumaker observing that Plaintiff was injured; (4) Officer Lane directing Officer Shumaker what to put in his report – and Shumaker's report not mentioning the evidence that the DEA agents had beaten Plaintiff; (5) Officer Lane telling Detective Seifert that he did not take witness statements because it would make the agents look

---

[33]*Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) (noting that officers cannot escape liability by hiding behind the officials they defraud)).

bad, and that they should "cover for them;" (6) Major Ware asking Seifert if he thought he was

an internal affairs investigator when Seifert produced the eye witness statements that the DEA

agents had beaten Plaintiff;  (7) Officer Lane telling Mrs. Bowling that Plaintiff was being held

in custody, not because he committed a crime but to allow agents more time to get their "stories

straight;" (8) Culp discussing the incident with Agent Johnson, and then telling Seifert and Ware

that federal agents would be coming to retrieve some information from Seifert's investigative

file; and (9) the delay Detective Seifert experienced in receiving statements from Officer Lane,

and the DEA agents.

It is clear that when viewed in the light most favorable to Plaintiff, there is evidence that

Defendants Lane, Ware and Culp knew that there was no probable cause to believe that Plaintiff

committed the crime of criminal damage to property.  Thus, when viewed in the light most

favorable to Plaintiff, there is evidence that Defendants violated the law.

The second step in the qualified immunity analysis is to determine if the law was clearly

established at the time of the incident.  Generally, the law is clearly established where there is a

Tenth Circuit precedent on point, but not necessarily a "case on all fours."[34]  The right must be

clearly established in a fairly

> particularized . . . sense: the contours of the right must be
> sufficiently clear that a reasonable official would understand that
> what he is doing violates that right. That is not to say that an
> official action is protected by qualified immunity unless the very
> action in question has previously been held unlawful, but it is to
> say that in light of pre-existing law the unlawfulness must be
> apparent.[35]

It is a violation of the Fourth Amendment for an officer to rely on false information for a

---

[34]*Cortez v. McCauley*, 478 F.3d 1108, 1144 n.11 (10th Cir. 2007).

[35]*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

determination of probable cause or to fabricate information or omit information that either creates or vitiates probable cause.[36]  If Plaintiff's account is believed, the officers could not have acted reasonably in light of clearly established law.

There is evidence in the record that Lane knew that the DEA agents were fabricating a story to their benefit.  An officer does not act reasonably when he knows the information he is acting on is false.[37]  If the jury finds Plaintiff's version of the facts to be true, it would effectively find that Lane violated Plaintiff's constitutional rights by fabricating and omitting evidence.

There is also evidence in the record that Ware and Culp knew that Seifert had doubts about the case and thought that the case should be referred to the internal affairs unit for investigation.  Furthermore, there is evidence in the record that Ware and Culp disregarded Seifert's account that Plaintiff was beaten and sent in "additional" evidence after speaking with the district attorney regarding the case.  Accordingly, it cannot be said that Ware and Culp acted reasonably under the circumstances, as they were aware of allegations of police brutality and aware of the improper investigation Lane conducted at the scene of the incident.  Accordingly, Defendants are not entitled to qualified immunity on Plaintiff's malicious prosecution claim.

B.    Abuse of Process

Defendants argue that Plaintiff's abuse of process claim must fail because the process was used for the purposes for which it was intended.  An abuse of process is based on the use of the judicial system for some process other than its intended purpose.[38]  In Kansas, "abuse of

---

[36]*Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Stewart v. Donges*, 915 F.2d 572, 581-83 (10th Cir. 1990)).

[37]*See Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008).

[38]*Gatlin v. Hartley, Nicholson, Hartley & Arnett, P.A.*, 26 P.2d 1284, 1287 (Kan. Ct. App. 2001).

process is concerned with process employed 'in a manner not contemplated by law, or to obtain an object which such process is not intended by law to effect.'"[39]  "The gravamen of that tort is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends."[40]  The difference between the tort of malicious prosecution and abuse of process is the latter is not concerned with commencing a process without justification, but with misusing or misapplying the process for an effect other than its designed purpose.[41]  In Kansas, the elements of an abuse of process claim are: "(1) that the defendant made an illegal, improper, perverted use of the process . . . and (2) that the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process . . . ."[42]

Plaintiff argues that his constitutional claim for abuse of process is proper because Defendants pursued the prosecution to prevent Plaintiff from pursuing a civil or criminal action against McCue.  The gist of Plaintiff's argument is that his continued prosecution was done not to obtain a conviction, but to prevent him from bringing a civil suit against McCue.  On summary judgment, it is Plaintiff's burden to produce evidence that, if believed by the jury, could lead to a verdict in his favor on his abuse of process claim.  Accordingly, Plaintiff must point to evidence in the record that tends to show that the officers pursued a criminal conviction to prevent Plaintiff from asserting a civil claim against McCue.

Plaintiff points to evidence that the DEA agents were given the weekend to plan their

---

[39]*Tappen v. Ager*, 599 F.2d 376, 380 (10th Cir. 1979) (quoting *Jackson & Scherer, Inc. v. Washburn*, 496 P.2d 1358, 1366 (Kan. 1972)).

[40]*Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994).

[41]*Tappen*, 599 F.2d at 380.

[42]*Id.* (quoting *Porter v. Stormont-Vail Hosp.*, 621 P.2d 411, 416 (Kan. 1980)).

concerted statements.  The agents were not interviewed separately or in person, but were given the luxury of drafting their statements sometime after the incident.  Additionally, there is evidence that Lane told Mrs. Bowling that Plaintiff was still in jail so that the agents could get their stories together, and that Lane told Seifert that reporting the actual accounts of witnesses from the scene would make the agents look bad.  This evidence could lead a reasonable jury to conclude that Defendants acted to prevent Plaintiff from filing his civil action against Agent McCue by instituting the prosecution.[43]

Defendants argue that the law is not clearly established in this area so that a reasonable officer would know that what he was doing was unconstitutional.  It is axiomatic that a claim under § 1983 should be based on some constitutional deprivation.[44]  Not all torts are actionable under the constitution.  Some, however, are actionable under § 1983 where it can be said with some certainty that there is an Amendment that confers such right.[45]  The Court has been unable to find any Tenth Circuit case dealing specifically with a § 1983 abuse of process claim, but any such claim would probably lie within the confines of the Fourteenth Amendment's Due Process

---

[43]Although Defendants do not cite to *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994), that court noted that an abuse of process claim based on alleged retribution could stand where plaintiff claimed that defendants instituted the criminal prosecution without probable cause.  *Id.*  In another Second Circuit case, the court found that there was a distinction between a claim for abuse of process when there was probable cause to prosecute the claim and one where there was no probable cause.  *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003).  With probable cause to prosecute, it does not matter for abuse of process purposes, that there was some collateral motive because the process was used to its lawful end.  *Id.*  Here, there is an issue of material fact as to whether there was probable cause to prosecute Plaintiff.  If there was probable cause, then both Plaintiff's abuse of process and malicious prosecution claims can not stand because preventing Plaintiff from filing a civil case would merely be a collateral effect of the criminal prosecution.  *See Titus v. Ahlm*, 297 F. App'x 796, **5 (10th Cir. Oct. 28, 2008) (noting that probable cause foreclosed plaintiff's malicious prosecution claim and retaliatory prosecution claim).

[44]*Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006).

[45]*Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) (citing *Carey v. Piphus*, 435 U.S. 247, 258-59 (1978)).

Clause.[46]

As noted above, when determining whether the law is clearly established, the Court does not have to find a case directly on point.[47]  The gist of the clearly established prong of qualified immunity is to ascertain if there was fair notice that officers could not do the alleged unlawful conduct.[48]  Here, the Court believes that a reasonable officer would have known that instituting a prosecution for some purpose other than for a criminal conviction would violate a person's constitutional rights.[49]  Indeed, it is implicit in any officer's oath to uphold the law.  Accordingly, Plaintiff has come forward with evidence, that if believed, could show a constitutional violation. And, Defendants are not entitled to qualified immunity on Plaintiff's abuse of process claim because the law is clearly established.

C.      Substantive and Procedural Due Process Claims

Plaintiff claims a violation of his right to substantive and procedural due process, by virtue of his having to pay $500 for a cash surety bond, and by virtue of having to go to trial. Plaintiff's argument is that Defendants violated his due process rights because he had to pay a

---

[46]*See Cook*, 41 F.3d at 80; *see also Erikson v. Pawnee County Bd. County Comm'rs*, 263 F.3d 1151, 1155 n.5 (10th Cir. 2001) (noting that "[b]ecause plaintiff has failed to allege facts showing that defendants conspired to prosecute him with an ulterior . . . motive separate . . . from the alleged desire to obtain [a] conviction[] without probable cause, plaintiff's allegations should only be analyzed in terms of an attempt to plead a claim for malicious prosecution.").  Although this Court's acknowledges an issue of whether there is a constitutional amendment applicable to an abuse of process claim, the Court does not explicitly address the issue because neither party argues it on summary judgment.  Plaintiff does note in the Pretrial Order that any claim would probably fall under the Fourth Amendment.  In the Second Circuit, at least, a § 1983 abuse of process claim falls under the Fourteenth Amendment.  *Supra* note 43.  In the context of abuse of process, however, this Court believes that the Fourth Amendment would probably be the more applicable constitutional protection, in light of *Becker v. Kroll* and the relationship between malicious prosecution and abuse of process.

[47]*Cortez v. McCauley*, 478 F.3d 1108, 1144 n. 11 (10th Cir. 2007).

[48]*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[49]*See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (noting that qualified immunity was not intended to provide relief to officers who failed to apply a familiar legal principle).

non-refundable $500 fee to a bondsman after spending a day in jail and that he did not have a fair

trial because the officers reported false information.  But these claims have been foreclosed by

Tenth Circuit precedent.

In *Becker v. Kroll*, the Tenth Circuit noted that "'at some point after arrest, and certainly

by the time of trial, a constitutional analysis [of a malicious prosecution claim] shifts to the Due

Process Clause.'"[50]  In the case of Becker, however, the Court determined that the Fourteenth

Amendment does not extend to "pre-trial deprivations of liberty."[51]  Instead, it is the Fourth

Amendment that governs Plaintiff's claim.[52]  As the Supreme Court noted, "[w]here a particular

Amendment 'provides an explicit textual source of constitutional protection' against a particular

sort of government behavior, 'that Amendment . . . must be the guide for analyzing these

claims.'"[53]

Here, Plaintiff argues that his pretrial deprivation was the loss of property—$500.

Because Plaintiff's deprivation of property stemmed from his arrest on the warrant issued, this

claim of loss of $500 is analyzed under the Fourth Amendment.[54]  Therefore, this claim is merely

a part of Plaintiff's malicious prosecution claim without probable cause.  The Court believes that

the $500 bond is merely a part of Plaintiff's damages to assess should he be successful on his

---

[50]*See Becker v. Kroll*, 494 F.3d 904, 918 (10th Cir. 2007) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-86 (10th Cir. 2004)).

[51]*Id.* at 920.

[52]*Id.* at 918 (citing *Albright v. Oliver*, 510 U.S. 266, 275 (1994)).

[53]*Albright*, 510 U.S. at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

[54]Plaintiff notes in his response that a procedural due process claim focuses on whether the state circumscribed the deprivation with adequate procedures.  In this context, officers had to have probable cause to seize Plaintiff, leading to his arrest and subsequent bond.

malicious prosecution claim.[55]  The same is true for Plaintiff's claim that he was forced   to go to

trial, as it extends from the Sixth Amendment.

       D.     Sixth Amendment Right to a Fair Trial

       Although not separately numbered as a claim in the Pretrial Order, Plaintiff apparently

pursues a claim for violation of his Sixth Amendment right to a fair trial.  The denial of a fair

trial under the Sixth Amendment is also a denial of due process under the Fifth and Fourteenth

Amendments.[56]  Plaintiff can show that his trial was unfair by illustrating that it was based on

false evidence or by providing evidence that an officer failed to provide exculpatory evidence,

which resulted in an unfair trial.[57]  However, regardless of any misconduct by the government

during trial, a defendant that is acquitted cannot be said to have been deprived of a fair trial.[58]

Here, Plaintiff was acquitted of criminal damage to property, accordingly, Plaintiff has failed to

show a constitutional violation based on the Sixth Amendment.  Defendants are entitled to

qualified immunity on Plaintiff's Sixth Amendment claim.

       E.     42 U.S.C. § 1983 Conspiracy

       Plaintiff claims that Defendants conspired with each other or with the DEA agents to

violate Plaintiff's Fourth Amendment, Sixth Amendment, and Fourteenth Amendment rights.  To

succeed on a § 1983 conspiracy claim, Plaintiff must plead and prove an actual conspiracy and a

---

[55]*Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (explaining that "in addition to general damages, 'compensation for any arrest or imprisonment, including damages for discomfort or injury to his health'" are damages recoverable on a claim for malicious prosecution) (citation omitted)).

[56]*Baker v. Hudspeth*, 129 F.2d 779, 781 (10th Cir. 1942).

[57]*Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999).

[58]*Id.*

constitutional violation; proof of one without the other is insufficient.[59]  Defendants challenge

plaintiff's § 1983 conspiracy claim, arguing that Plaintiff cannot show a constitutional violation

and that Plaintiff cannot provide evidence of an agreement.  As analyzed above, Plaintiff has

produced evidence from which a reasonable jury could find that Defendants violated his

constitutional rights.

To establish a conspiracy, Plaintiff must show that there was some agreement or meeting

of the minds to violate his constitutional rights.[60]  Generally, there exists no written agreement

by the alleged conspirators to violate one's constitutional rights; therefore, a conspiracy may be

inferred from circumstantial evidence.[61]  A party claiming a conspiracy must show that there was

some plan, the essential terms of which each defendant knew. [62]

Defendants argue that there is no evidence in the record tending to show that they

conspired to prosecute Plaintiff without probable cause and cover up the DEA agents' beating of

Plaintiff.  The record, however, is replete with circumstantial evidence that Culp, Ware, and

Lane conspired to prosecute Plaintiff for criminal damage to property.  Most notable is the

evidence that Culp insisted that the district attorney reconsider his decision to decline

prosecution.  Culp had instructed Ware to keep a close eye on the case because it was of interest

to Culp.  Additionally, Culp said that Seifert should not investigate the alleged police misconduct

but only the assault on McCue.  Furthermore, Plaintiff presented evidence that Lane was

covering for the DEA agents by declining to record witness statements at the scene of the

---

[59]*Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990) (citation omitted).

[60]*Brever v. Rockwell Intern. Corp.*, 40 F.3d 1119, 1126 (10th Cir. 1994) (citations omitted).

[61]*Snell*, 920 F.2d at 702 (citation omitted).

[62]*Id.* (citation omitted).

incident.  Lane failed to take any photographs of the vehicles at the scene, failed to take any

photographs of Plaintiff, and failed to note that Plaintiff was beaten by the DEA agents.

Moreover, there is evidence that Lane and the agents delayed filing their statements about the

investigation.  This evidence, if believed could show that there was a conspiracy between Culp,

Ware, and Lane to violate Plaintiff's constitutional rights by continuing the prosecution for

criminal damage to property to cover up the DEA agents' brutality.  Accordingly, Plaintiff has

come forward with enough circumstantial evidence, if believed, to show a conspiracy to violate

his constitutional rights.

   F.  Supervisor Liability

   Plaintiff brings a claim of supervisor liability against Defendant Ron Miller, in his

capacity as Chief of Police.  Although a supervisor may be held liable under § 1983 for the

actions of his subordinates, a supervisor's liability is not based on *respondeat superior*, but on

the supervisor's own actions or inactions.[63]  A supervisor may be liable under § 1983 for the acts

of his subordinates if plaintiff can show a subordinate violated the Constitution and an

affirmative link between the supervisor and the violation.[64]  In essence, a plaintiff must show that

the supervisor was involved in the alleged constitutional violation, either through personal

direction or actual knowledge of wrongdoing and acquiescence.[65]  Generally, this means that the

supervisor either acquiesced or was deliberately indifferent to the subordinate's unconstitutional

conduct, and the supervisor's action or inaction is affirmatively linked to the deprivation of

---

[63]*Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000) (citing *Gagan v. Norton*, 35 F.3d1473, 1476 n.4 (10th Cir. 1994)).

[64]*Lowery v. County of Riley*, 522 F.3d 1086, 1092-93 (10th Cir. 2008) (citing *Serna v. Colo. Dept. of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006)).

[65]*Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992) (citations omitted).

federal rights.[66]

Liability under § 1983, however, does not require direct participation; the causal connection can be established if defendant knew or should have known that his inaction or actions would cause the constitutional violation.[67]  "A supervisor . . . may [also] be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable."[68]  This lack of training or lack of policy must be somehow connected to the alleged constitutional violations—namely, Plaintiff must show that Miller's failure in training and implementing a policy lead the officers to violate his constitutional rights.[69]

In this case, Plaintiff asserts constitutional violations based on the Fourth Amendment and the Fourteenth Amendment, arguing that Defendants continued the prosecution against him without probable cause and abused the criminal process to prevent him from filing a civil claim. The gist of Plaintiff's claim is that Miller's failure to implement policies or train officers in investigating misconduct by other police agencies effectively lead Culp, Ware, and Lane to operate under the "blue code."[70]  The evidence of operation under the blue code is that the DEA agents were given more time to turn in statements; they were not interviewed in person; no

---

[66]*Serna*, 455 F.3d at 1152 (citations omitted).

[67]*Buck v. City of Albuquerque*, 549 F.3d 1269, 1279-80 (10th Cir. 2008) (citing *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)).

[68]*Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988) (citing *Hays v. Jefferson County*, 668 F.2d 869, 873-74 (6th Cir. 1982)); *see also Sutton v. Utah Sch. for Deaf & Blind*, 173 F.3d 1226, 1242 (10th Cir. 1999) (stating that "a supervisor may be individually liable for failing to adopt or implement policy or training of subordinates to prevent deprivations of constitutional rights.").

[69]*See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 402–04 (1997).

[70]The "blue code" is the idea that law enforcement officers have an unwritten policy geared at "covering" for each other to prevent their misconduct from coming to light.

photographs of the vehicle were taken at the scene by the Kansas City police officers; and no statements were taken from witnesses at the scene; Seifert testified that Lane said witness statements were not taken because it would look bad for the agents. Mrs. Bowling testified that Lane said that Plaintiff was still in jail so that the agents could get their story together.  And Mrs. Bowling and Plaintiff testified that Lane initially told him it was just an accident but later said that he was going to jail, and that DEA agents did whatever they wanted.  This evidence in the record, if believed, shows that these officers operated under a so-called blue code.

There is no evidence, however, that Miller knew about any such blue code, or that he should have known about it.  There is no evidence that Miller was involved with, or participated in, the deprivation of Plaintiff's rights.  It is uncontroverted that Miller was not at the scene of the incident.  And, although Miller knew about the case because Culp reported to him, there is no evidence that Miller knew about the specifics of the investigation.  Plaintiff filed no internal affairs complaint against the KCK , nor did Plaintiff otherwise communicate with the police department making Miller aware of Plaintiff's version of the incident.  In addition, there is no evidence that Miller was indifferent to Plaintiff's constitutional rights by failing to implement these policies or training techniques aimed at preventing application of the blue code.

Essentially, Plaintiff's position is that the lack of training or policies in place served as tacit authorization of or knowing acquiescence in the violation of Plaintiff's constitutional rights by Culp, Ware and Lane.  But, to establish supervisory liability, "it is not enough to point after the fact to a particular sort of training which, if provided, might have prevented the harm suffered in a given case."[71]  Liability in this case, "attaches only if a constitutional violation is

---

[71]*Compare Vaughn v. Greene County, Ark.*, 438 F.3d 845, 851 (8th Cir. 2006) (noting that there was no indication that defendant had notice of the inadequacy of the training or policies to assess personal liability); *Mercado v. City of Orlando*, 407 F.3d 1152, 1157, 1158 (11th Cir. 2005) (reasoning that a supervisor is not liable

'part of a pattern' of misconduct, or 'where there is essentially a complete failure to train the
police force, or training that is so reckless or grossly negligent that future police misconduct is
almost inevitable or would properly be characterized as substantially certain to occur.'"[72]
Without more, Miller cannot be held liable under § 1983 for failing to train officers or for failing
to implement policies to manage circumstances where there are allegations that an officer from
another agency violated an individual's rights, and allegations that KCK officers participated in
or covered up such violations. .  Plaintiff has produced no evidence that there was a lack of
training on the probable cause standard, or the proper use of process or investigation.
Accordingly, Plaintiff's claim for supervisory liability fails.

      F.     *Monell* Liability

      An action against a municipality and an action against a municipal official in his official
capacity is one in the same.[73]  "A municipality may not be held liable under § 1983 solely
because its employees inflicted injury on the plaintiff."[74]  To establish municipal liability, a
plaintiff must show "(1) that a municipal employee committed a constitutional violation, and (2)
that a municipal policy or custom was the moving force behind the constitutional deprivation."[75]
"A municipality may not be held liable where there was no underlying constitutional violation by

_____

because he was not at scene, did not acquiesce, and could not anticipate that subordinate would act in that manner
where there was no history of misconduct); *Ontha v. Rutherford County, Tenn.*, No. 05-6556, 2007 WL 776898, at
*5,*6 (6th Cir. Mar. 13, 2007) (stating that there is no suggestion that these events occurred repeatedly or that they
were so likely to happen as to be deliberately indifferent to an individual's rights), *with Sutton*, 173 F.3d at 1240-41
(finding that claim was valid with allegations that there were repeated instances of conduct by subordinate and
supervisor failed to take action).

    [72]*Ontha*, 2007 WL 776898, at *5,*6.

    [73]*Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 695 (10th Cir. 1988).

    [74]*Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

    [75]*Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

any of its officers."[76]  To warrant liability, "a municipality policy must be a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by a municipality's officers.'"[77]  Requiring a "'policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.'"[78]  Even if the conduct of the municipality cannot be characterized as a policy, the municipality can "still be held liable if the practice is so permanent and well-settled as to constitute a custom or usage with the force of law.'"[79]  In addition, a plaintiff must show that the policies or lack thereof were somehow directly connected to the constitutional deprivation.[80]

Plaintiff argues that the lack of policy and the inadequate training lead to his malicious prosecution and violation of his due process rights.  According to Plaintiff, because Miller, as the final policy maker for the Kansas City Police Department, did not have policies in place nor provided any training to guide officers when investigating allegations of misconduct occurring within its jurisdiction by officers from other jurisdictions, Plaintiff's constitutional rights were violated and officers consequently fell back to the "blue code."

A municipality's liability for failure to train its officers is triggered only when there is a showing that the failure amounted to deliberate indifference to the rights of those the officers

---

[76]*Hinton*, 997 F.2d at 782 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

[77]*Lankford v. City of Hobart*, 73 F.2d 283, 286 (10th Cir. 1996) (quoting *Starret v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989)).

[78]*Strepka .v Sailors*, 494 F. Supp. 2d 1209, 1229 (D. Colo. 2007) (quoting *Bryan County v. Brown*, 520 U.S. 397, 403 (1997)).

[79]*Strepka*, 494 F. Supp. 2d at 1229 (quoting *Lankford v. City of Hobart*, 73 F.2d 283, 286 (10th Cir. 1996)).

[80]*Weimer v. Schraeder*, 952 F.2d 336, 341 (10th Cir. 1991).

will inevitably come into contact with.[81]  To succeed, a plaintiff must identify a deficiency in the officer's training and show that the deficiency was the cause of his constitutional violation.[82] When operating under a failure to train theory, a plaintiff must either show that there was some pattern of behavior by officers that was unconstitutional and the municipality failed to act, or that the highly predictable consequence of a failure to train was the violation of an individual's constitutional right.[83]  The Court, on review of the record, cannot find any evidence that Miller, as the policy head, would have known that a failure to train employees or provide a policy in investigating alleged abuse by another agency would cause officers to follow the blue code and violate Plaintiff's constitutional rights.  More specifically, Plaintiff wants the Court to accept that it was foreseeable that a failure to train or provide policies in this respect lead to his malicious prosecution and subsequent violation of his due process rights.  The Court cannot agree.

It is hardly obvious that the failure to train officers in investigating alleged misconduct by another agency's officers would cause malicious prosecution or violate a person's due process rights.  In fact, it goes without saying that an officer's obligation to uphold the law means that an officer cannot fabricate or "cover" for other officers when they know that the other officers are not telling the truth.[84]  No policy was needed in this respect, and even if there was a policy

---

[81]*Id.*

[82]*City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989).

[83]*City of Canton*, 489 U.S. at 390.

[84]*Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) (noting that "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."); *Carr v. Castle*, 337 F.3d 1221, 1232 (10th Cir. 2003) (noting that even if some inadequacy in training was shown, plaintiff cannot show how that inadequacy directly caused the violation of his rights); *Hernandez v. Borough of Palisades Park Police Dep't.*, 58 F. App'x. 909, 914 (3d Cir. 2003) (explaining that "the failure to train police officers that they should not commit burglaries, or the failure to supervise them to ensure that they do not commit such felonies, is not so likely to result in a violation of a constitutional right.").

stating such, it would have hardly prevented an officer from disregarding it.  Accordingly, the Court cannot see a causal connection between the municipality's failure to train and the constitutional deprivations of malicious prosecution and abuse of process.

      G.     State Law Claims

      The elements of Plaintiff's state law claims for malicious prosecution and abuse of process are stated above.  As Defendants only challenge the probable cause element of Plaintiff's malicious prosecution claim and the Court has already found that a material issue of fact remains for trial, summary judgment is not warranted on this claim.  The same is true of Plaintiff's abuse of process claim.

## IV.    CONCLUSION

**In conclusion, Defendants' motion for summary judgment is granted in part and denied in part.**

**IT IS THEREFORE ORDERED BY THE COURT** that:

**(1) Defendants' Motion for Summary judgment (Doc. 192)  is GRANTED in part, on**:

> (1) Plaintiff's § 1983 supervisory liability claim against Defendant Miller; (2) Plaintiff's § 1983 *Monell* claim against Defendant Unified Government; (3) Plaintiff's § 1983 claims under the Sixth Amendment for malicious prosecution and abuse of process against Defendants Culp, Ware, and Lane because they have qualified immunity; and (4) Plaintiff's § 1983 claims of substantive and procedural due process under the Fourteenth Amendment against Defendants Culp, Ware and Lane; and

**(2) Defendants' Motion for Summary Judgment  (Doc. 192) is DENIED in part, on:**

(1) Plaintiff's § 1983 claim under the Fourth  Amendment for malicious prosecution against Defendants Culp,Ware and Lane because they do not have qualified immunity;

(2) Plaintiff's § 1983 claim under the Fourth Amendment for abuse of process against Defendants Culp, Ware, and Lane because they do not have qualified immunity; (3) Plaintiff's § 1983 claim of conspiracy to violate Plaintiff's rights against Defendants Culp, Ware,  and Lane because they do not have qualified immunity; (4) Plaintiff's state law claim of malicious prosecution against Defendants Unified Government, Miller, Culp, Ware and Lane; and (5) Plaintiff's state law claim of abuse of process against Defendants Unified Government, Miller, Culp, Ware and Lane.

**IT IS SO ORDERED.**

Dated:  <u>March 17, 2009</u>

         S/ Julie A. Robinson_____
        JULIE A. ROBINSON
        UNITED STATES DISTRICT JUDGE