# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BARRON R. BOWLING,            ) | |
|           ) | |
|        Plaintiff,      ) | |
|           ) | |
|     vs.                ) | **Case No. 04-2320-JAR** |
|           ) | |
| UNITED STATES OF AMERICA,    ) | |
|           ) | |
|        Defendant.     ) | |
| _____) | |

## MEMORANDUM AND ORDER

This is a case that began with road rage fueled by egos and unwarranted self-righteousness, and aggravated by disguised identity. A Drug Enforcement Administration Agent ("DEA agent"), acting in an undercover capacity—but with the authoritative sentiments and expectations of an on-duty, uniformed law enforcement officer in a marked police vehicle—commits a traffic offense, expects an unwitting but equally self-righteous civilian motorist to yield, and then explodes with rage after the ensuing collision and damage to his government-owned vehicle. The Court heard nineteen days of testimony, from law enforcement officers, eyewitnesses to the events transpiring after the collision, as well as from expert witnesses on excessive force, the likely cause of the collision, and the consequential medical and psychological damages suffered by plaintiff. As the trier of fact, this Court listened intently to the often conflicting testimony and considered the many means by which each party sought to impeach adverse witnesses. This Court, perhaps as importantly, watched intensely the manner and demeanor of the witnesses who testified. Just as this Court routinely instructs jurors in cases in which they routinely determine issues of credibility, this Court evaluated the testimony of the

witnesses, as well as all other evidence in this light.[1]

Ultimately, this Court concludes that the preponderance of the evidence establishes that DEA Special Agent Timothy McCue assaulted and battered plaintiff Barron Bowling, and used excessive force in arresting and taking plaintiff into custody; and that DEA Special Agent Brendan Fitzpatrick and federally-deputized DEA Task Force Officer Brandon Collins did not stop McCue from committing assault, battery and using excessive force. This Court further concludes that plaintiff sustained a closed head injury, a concussion and has since, as a proximate result, suffered from post-concussion syndrome, which presents with a panoply of symptoms ranging from the annoying and aggravating to the impairing. The Court thus grants judgment on plaintiff's claims of assault, battery and excessive force, and orders damages in the total amount of $833,250.

Plaintiff had three other theories or claims for relief in this action brought against defendant under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* The Court

---

[1]Among the instructions the Court routinely gives to juries to guide their evaluation of witnesses, is the following:

> You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his or her testimony. In weighing the testimony of a witness you should consider the witness's relationship to the plaintiff or to the defendant; any interest the witness may have in the outcome of the case; the witness's manner while testifying; the opportunity and ability to observe or acquire knowledge concerning the facts about which the witness testified; the witness's candor, fairness and intelligence; and the extent to which the witness has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

> When weighing conflicting testimony you should consider whether the discrepancy has to do with a material fact or with an unimportant detail, and should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

> In addition, while you must consider only the evidence in the case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions which reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in the case.

grants defendant's motion to dismiss these three other claims on jurisdictional grounds. In Part I of this Memorandum and Order, the Court addresses defendant's motion to dismiss these three claims. In Part II of this Memorandum and Order, the Court makes findings of fact and conclusions of law on the sole remaining claims under the FTCA for assault, battery and excessive force, and grants judgment to plaintiff on these claims.

**PART I.        Motion to Dismiss Claims**

Plaintiff Barron Bowling brought this action against the United States, under the FTCA, and against the Unified Government of Wyandotte County Kansas and certain law enforcement officers of the Kansas City, Kansas Police Department, an arm of the Unified Government, under 18 U.S.C. § 1983. The claims against the Unified Government and its police officers were dismissed prior to trial.

As set forth in the Pretrial Order, the remaining claims at the time of trial were claims against the United States for assault, battery, excessive force and civil conspiracy. Specifically, the four remaining claims were: (1) DEA Special Agent McCue, DEA Special Agent Fitzpatrick, or DEA Task Force Officer Collins used excessive and unreasonable force on, assaulted, or battered plaintiff in the course of arresting him or after his arrest; (2) McCue, Fitzpatrick and Collins, or any two of them, engaged in a civil conspiracy to use excessive and unreasonable force on, to assault, or to batter plaintiff in the course of arresting him or after his arrest; (3) McCue, Fitzpatrick, and Collins, or any two of them, engaged in a civil conspiracy among themselves to subject plaintiff to malicious prosecution on the charge of criminal damage to property; or (4) McCue, Fitzpatrick, or Collins engaged in a civil conspiracy with Steven Culp, Dennis Ware or Robert Lane, who were Kansas City, Kansas police officers, to subject plaintiff

3

to malicious prosecution on the charge of criminal damage to property.

This case was presented in a highly unusual procedural posture at trial. Defendant filed no dispositive motions prior to trial; the parties represented to the Court that as part of settlement negotiations, the defendant agreed not to file any dispositive motions. Only after a nineteen-day bench trial, defendant has moved to dismiss, on jurisdictional and other grounds, three of the four claims brought by plaintiff. Because federal courts are courts of limited jurisdiction, a party may question the Court's subject matter jurisdiction at any time, including on appeal.[2] Defendant raised these arguments for the first time during trial. Needless to say, had defendant filed its motion for dismissal or summary judgment on these claims, the parties would not have expended so much time and money in trial. Apparently, the parties were willing to bear the burden of time and expense in trying claims that might ultimately be dismissed, without any regard for the burden this placed on the Court's time and schedule.

Thus this matter now comes before the Court on Defendant United States of America's Motion to Dismiss All of Plaintiff's Claims Except Assault Based on Lack of Subject Matter Jurisdiction, and Motion for Judgment as a Matter of Law Based on Plaintiff's Failure to Satisfy His Burden of Proof on Various Claims with Memorandum in Support Included (Doc. 386). The Court directed the parties to brief the issues raised in defendant's motion to dismiss. The matter is now fully briefed and the Court is prepared to rule. For the reasons set forth in detail in Part I

---

[2]*Am. Fire & Cas. Co. v. Finn,* 341 U.S. 6, 18 (1951); *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) ("Rule 12(h)(3) of the Federal Rules of Civil Procedure provides that 'whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action'"); *Mires v. United States*, 466 F.3d 1208, 1211 (10th Cir. 2006) ("To ensure its Article III power is exercised properly, a federal court must, "in every case and at every stage of the proceeding, satisfy itself as to its own jurisdiction.").

of the Memorandum and Order, defendant's motion to dismiss is granted in part and denied in part. The Court dismisses the conspiracy claims, but does not dismiss the claims of assault, battery and excessive force. In Part II of this Memorandum and Order, the Court sets forth its findings of fact and conclusions of law, in denying defendant's motion for judgment and in granting plaintiff judgment on his claims of assault, battery and excessive force, under the FTCA.

One of the express purposes of the Pretrial Order is to "obtain[] admissions and stipulations about facts and documents to avoid unnecessary proof."[3] The parties have stipulated that, at all times relevant to these claims, McCue, Fitzpatrick, and Collins (the "three federal agents") were acting under color of federal authority and within the scope of their employment as either a DEA special agent or a deputized task force officer.[4] To the extent the parties continue to dispute the exact claims in this case—whether plaintiff is asserting claims for aiding and abetting or abuse of process—any claims not preserved in the Pretrial Order will not be addressed by this Court. Furthermore, the FTCA does not recognize claims for violation of federal or constitutional law.[5]

In its motion, defendant argues that this Court lacks subject matter jurisdiction over certain claims, in that plaintiff failed to exhaust his administrative remedies on all claims except assault, and because Kansas law does not recognize a conspiracy claim against a governmental entity based on the actions of its employees while acting within the scope of their employment.

---

[3]Fed. R. Civ. P. 16(c)(2)(C)–(D).

[4]*See* Pretrial Order, Doc. 178 at 4.

[5]*F.D.I.C. v. Meyer*, 510 U.S. 471, 477–78 (1994).

Because such claims are not recognized under state law, defendant argues that the FTCA does not accord a waiver of sovereign immunity allowing such claims to be brought against the United States.

## A. Administrative Exhaustion

"The FTCA waives the federal government's sovereign immunity to suits for money damages arising out of the negligence of government agents."[6] As a precondition to bringing an action against the United States in federal court, the FTCA requires a claimant to exhaust administrative remedies.[7] "The exhaustion of the administrative claim process is a jurisdictional prerequisite to a FTCA action."[8] Because the requirement is jurisdictional, it cannot be waived.[9] To satisfy the exhaustion requirement, per 28 U.S.C. § 2675(a), a claimant must file an administrative claim with the appropriate federal agency that includes "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."[10] "The FTCA's exhaustion requirement is intended to provide notice to the agency so that it can conduct its own investigation of the claim. It also serves to ease court congestion and avoid unnecessary litigation."[11] Because the notice requirement is

---

[6]*Barnes v. United States*, 137 F. App'x 184, 187 (10th Cir. 2005).

[7]*Id.*

[8]*Strohm v. United States*, No. 06-4139-SAC, 2007 WL 3120704, at *3 (D. Kan. Oct. 24, 2007) (citations omitted) (citing *Pipkin v. United States Postal Serv.*, 951 F.2d 272, 273 (10th Cir. 1991)).

[9]*Id.*

[10]*Id.* (quoting *Cizek v. United States*, 953 F.2d 1232, 1233 (10th cir. 1992)).

[11]*Id.* (citing *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 852–53 (10th Cir. 2005); *Frantz v. United States*, 29 F.3d 222, 224 (5th Cir. 1994)) (emphasis added).

jurisdictional, it is to be construed strictly,[12] but "should not be interpreted inflexibly."[13]

Under federal regulations, "a claim shall be deemed to have been presented when a Federal agency receives from a claimant, . . . an executed Standard Form 95 or other written notification of an *incident*, accompanied by a claim for money damages . . ."[14] An administrative claim must give "notice of the facts and circumstances underlying a claim rather than the exact grounds upon which plaintiff seeks to hold the government liable."[15]

In determining what level of specificity satisfies § 2675(a), the Tenth Circuit adopted the "pragmatic approach," "requiring only that the administrative claim contain sufficient facts to enable the agency to begin its own investigation of the alleged events."[16] The test to determine if plaintiff has satisfied the notice-of-claim requirement is:

> [whether] the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought.[17]

"[A] plaintiff cannot 'present one claim to the agency and then maintain suit on the basis of a different set of facts.'"[18] If the facts surrounding a possible cause of injury are not discussed in

---

[12]*Bradley v. United States ex rel. Veterans Admin.*, 951 F.2d 268, 270 (10th Cir. 1991).

[13]*Estate of Trentadue*, 397 F.3d at 853 (citing *Dynamic Image Tech., Inc. v. United States*, 221 F.3d 34, 40 (1st Cir. 2000)) (adopting First Circuit's holding).

[14]28 C.F.R. § 14.2 (emphasis added).

[15]*Estate of Trentadue*, 397 F.3d at 853 (emphasis added); *Staggs v. United States*, 425 F.3d 881, 884 (10th Cir. 2005).

[16]*Strohm*, 2007 WL 3120704, at *4.

[17]*Estate of Trentadue*, 397 F.3d at 852–53 (quoting *Dynamic Image Tech.*, 221 F.3d at 40) (adopting First Circuit's holding).

[18]*Strohm*, 2007 WL 3120704, at *4 (quoting *Dundon v. United States*, 559 F. Supp. 469, 476 (E.D.N.Y. 1983)).

the administrative claim, then that possible cause of injury cannot support a later claim in federal court.[19]  The claim form "need not place a federal agency on notice of 'every conceivable legal theory' or cause of action that could potentially be brought in relation to an injury described in that claim,"[20] but it should "fairly apprise[] the Government of the facts leading to the claimant's injury."[21]  A claim must "provide the defendant with sufficient information to enable the agency to conduct a full investigation of the incident stated by the plaintiff[]."[22]

Here, plaintiff's two-page SF 95 form administrative claim included a seven-page attachment setting forth the facts and circumstances supporting his claims.  In addition to these documents, plaintiff attached affidavits, deposition excerpts, photographs and copious medical records prepared by other people, totaling 298 pages.  The Court reviewed the attached documents, although many of the pictures and handwritten notes prepared by plaintiff's doctors were illegible.  The attachment provided sufficient notice, as well as sufficient detail to support plaintiff's claims of assault, battery, and excessive force.  The attachment detailed that the three federal agents, McCue and Fitzpatrick and DEA task force officer Collins, threatened plaintiff, beat him as he was being handcuffed, called him racist and perjorative names, placed him bare-chested on hot pavement in the late afternoon sun, kicked him, and struck his head with the butt

---

[19]*Id.* (quoting *Earl v. United States*, No. 07-cv-00476-MJW-CBS, 2007 WL 2572272, at *1 (D. Colo. Sept. 4, 2007)); *Kikumura v. Osagie*, 461 F.3d 1269, 1302 (10th Cir. 2006).

[20]*Strohm*, 2007 WL 3120704, at *4 (noting that the Tenth Circuit generally requires the claimant to give "reasonable notice of the actual source of his injury").

[21]*Id.* at *5.

[22]*Focke v. United States*, 597 F. Supp. 1325, 1350 (D. Kan. 1982); *see Kirby v. United States*, No. 07-cv-568-PJC, 2009 WL 302077, at *8 (N.D. Okla. Feb. 6, 2009) (noting that, under Sixth and Eleventh Circuit law, the administrative agency is deemed to be on notice of "the theories of recovery that its reasonable investigation of the specific allegations of the claim should reveal") (quoting *Burchfield v. United States*, 168 F.3d 1252, 1255 (11th Cir. 1999).

of a gun. After they handcuffed him they continued to beat him, hitting him repeatedly in the head and kicking his stomach and back.

Plaintiff's claims of a conspiracy to assault, batter, and/or use excessive force, are less apparent, but still supported by the facts provided in the administrative claim. Plaintiff alleged that the three federal agents beat him in concert. Because conspiracy may be inferred from circumstantial evidence,[23] the Court finds these facts were sufficient to give notice to the agency of a possible conspiracy.

Further, plaintiff's claim of conspiracy among the three federal agents to commit malicious prosecution is sufficiently supported by the facts alleged in the administrative claim. Plaintiff alleges that he was charged in state court with criminal damage to property, arising out of the collision, a charge for which he was innocent. And, he alleges that the arrest and charges were part of the federal agents' effort to conceal that plaintiff was illegally stopped, arrested without probable cause and beaten, despite never having resisted the officers and never having given them reason to use any force.

But, the facts set forth in the administrative claim do not support plaintiff's claim that the Kansas City, Kansas police officers (hereinafter "police officers") were involved in a conspiracy with federal agents to maliciously prosecute plaintiff. First, while the administrative claim specifically lists "[p]ersons involved" as plaintiff, DEA Agents McCue and Fitzpatrick and DEA task force officer Collins, it does not identify the police officers involved. And, the claim provided very few facts about the police officers' involvement in the incident. Plaintiff claimed

---

[23]*York v. InTrust Bank, N.A.*, 962 P.2d 405, 423 (Kan. 1998) ("a conspiracy may be proven by either showing the conspiracy itself or by showing the separate acts of the conspirators involving the same purpose or object").

that after the beating, other DEA agents and police officers arrived on the scene. "One of the police officers, Detective Robert Lane, interviewed Bowling . . . [and] Lane told Bowling he would do what he could to help him in the situation." Later, police officers interviewed eyewitnesses who confirmed that plaintiff had been beaten and threatened after his arrest even though he offered no resistance. The administrative claim further states that despite the absence of probable cause, the three federal agents "arrested Bowling and turned him over to the Kansas City, Kansas Police Department, which detained him overnight, then released him." Further, "[t]he arrest and charging of Bowling is part of the agents' effort to cover up the fact that Bowling was illegally stopped and beaten"; and "[t]he unconstitutional actions of all three defendants [presumably the DEA agents and TFO identified] included the unconstitutional use of excessive force and the seizure of Bowling without probable cause, all in violation of the Fourth and Fifth Amendments."[24] The claim then concludes by stating, "[t]he actions of McCue, Fitzpatrick and Collins were not only unconstitutional, they were also willful, cruel and malicious."

Even upon reviewing the other documents and exhibits attached to the administrative claim, a civil conspiracy with the police officers is not apparent. In affidavits given by two eyewitnesses to the incident, they stated that Detective Lane advised them that he was going to have the charges dropped. There simply is no suggestion that Lane engaged in a "conspiracy" with federal agents; Lane offered to help plaintiff. Moreover, the names of Culp and Ware never appear in the administrative claim. The administrative claim lacks facts supporting or giving notice that any of the police officers were engaged in a conspiracy with the federal agents.

---

[24]It should be noted that plaintiff dismissed his *Bivens* claims against these federal agents.

Because the Court concludes that the claim of civil conspiracy between the federal agents and police officers was not administratively exhausted, the Court lacks subject matter jurisdiction over this claim. Thus, the Court need not address whether such claim would be actionable under the FTCA. Nonetheless, the Court concludes that such claim is not actionable, as more fully explained in subsection B, below.

### B. None of the Conspiracy Claims is Actionable

Plaintiff claims that the three federal agents conspired among themselves to commit assault and battery, to use excessive force and to maliciously prosecute him. Defendant argues such claims are not actionable under the FTCA because Kansas law would not recognize such conspiracy claims involving, and against, a single legal entity. More specifically, defendant argues that Kansas law would apply the intracorporate conspiracy doctrine to plaintiff's conspiracy claims. Plaintiff responds that this defense is not jurisdictional but factual, and that defendant waived this defense by failing to assert it in its answer or the pretrial order. Finally, plaintiff argues that the intracorporate conspiracy doctrine has no application under the FTCA, because the United States is made liable under a respondeat superior theory for all the tortious conduct of its employees.

At issue, is whether these conspiracy claims are within the scope of the FTCA, a statute that grants a limited waiver of the sovereign immunity otherwise accorded to the United States.[25] Sovereign immunity is jurisdictional, therefore, "the terms of the United States' consent to be

---

[25] *Sydnes v. United States*, 523 F.3d 1179, 1183 (10th Cir. 2008). The Tenth Circuit has explained the significance of the limited waiver of sovereign immunity provided under the FTCA: "The FTCA lists many types of claims for which the United States has consented to be sued. Included among these are claims for certain injuries caused by government employees acting within the scope of their employment. 28 U.S.C. § 1346(b). But the FTCA's waiver in this field is subject to (many) exceptions, and what the sovereign giveth it may also take away." *Id.*

sued in any court define that court's jurisdiction to entertain the suit."[26] "Because the sovereign may not be sued without its consent, plaintiff[] cannot proceed without establishing that the United States has agreed to answer to their claims in court."[27] Moreover, the FTCA "represents a waiver of the United States' immunity and must, therefore, be strictly construed."[28]

Therefore, whether a particular claim is "cognizable" under the FTCA depends on whether § 1346(b) grants the federal district courts jurisdiction over the claim such that "the United States has waived its sovereign immunity and rendered itself liable."[29] The Supreme Court has explained that claims are cognizable under § 1346(b) if they are asserted in the following fashion:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.[30]

In § 2680, the FTCA has excluded certain state law claims that might otherwise be actionable under § 1346, and the Tenth Circuit has held that these exclusions affect the subject matter

---

[26]*F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)) (internal alterations omitted).

[27]*Sydnes v. United States*, 523 F.3d 1179, 1182–83 (10th Cir. 2008) ("the party asserting jurisdiction bears the burden of proving that sovereign immunity has been waived").

[28]*Hart v. Dep't of Labor ex rel. United States*, 116 F.3d 1338, 1339 (10th Cir. 1997).

[29]*F.D.I.C.*, 510 U.S. at 476 (internal alterations omitted) (citing *Richards v. United States*, 369 U.S. 1, 6 (1962)).

[30]*Id.* at 477 (quoting 28 U.S.C. § 1346(b)).

jurisdiction of federal courts.[31]

A court must first decide whether plaintiff's claims come within the limited waiver of immunity set forth in § 1346(b) before proceeding to the exclusions and exceptions in § 2680.[32] The substantive basis of liability under the FTCA is the "law of the place," which the Supreme Court has defined as state substantive law.[33] With this in mind, the Court analyzes plaintiff's conspiracy claims under the statutory language of § 1346(b).

### i. Analogy with a Private Person

The Court focuses on the sixth element of § 1346(b) to determine whether the United States has consented to be made liable for civil conspiracy. Under § 1346(b), the United States's liability is equivalent to that of a "private person." Section 2674 provides that the United States's liability is determined "in the same manner and to the same extent as a private individual under like circumstances." Under both provisions, the government is a single individual. If there is no analogous private liability under Kansas law, then this Court lacks subject matter jurisdiction over plaintiff's conspiracy claims under the FTCA.[34] "[I]f a private person would be shielded from liability under the statute, the United States must also be shielded."[35]

The Court must apply "the law of the place where the act or omission complained of

---

[31]*See, e.g.*, *Garcia v. United States Air Force*, 533 F.3d 1170, 1175–76 (10th Cir. 2008); *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1166 (10th Cir. 2004); *Domme v. United States*, 61 F.3d 787, 789 (10th Cir. 1995); *Baird v. United States*, 653 F.2d 437, 440 (10th Cir. 1981).

[32]*Sheridan v. United States*, 487 U.S. 392, 400 (1988) ("the intentional tort exception is simply inapplicable to torts that fall outside the scope of § 1346(b)'s general wavier").

[33]*F.D.I.C.*, 510 U.S. at 478.

[34]*Barnson v. United States*, 531 F. Supp. 614, 619–20 (D. Utah 1982); 28 U.S.C. § 1346(b).

[35]*Cox v. United States*, 881 F.2d 893, 895 (10th Cir. 1989).

occurred."[36]  The parties agree that the events occurred in Kansas and Kansas law defines the substantive liability of the United States under the FTCA.  Under Kansas law, the elements of a civil conspiracy include:  "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."[37]  The Court turns to the statutory language of § 1346 to determine whether the sovereign's waiver of immunity includes such a claim.

Under § 1346(b)'s general waiver of immunity, the United States is treated as a singular individual.  Under Kansas law, a single person cannot engage in the first and third elements of civil conspiracy unless a second defendant is also sued.  The very nature of civil conspiracy requires a meeting of the minds between "two or more persons" to perform an underlying tort.[38] The FTCA only waives the United State's sovereign immunity to the extent it is sued and held liable as an "individual"[39] or "a private person."[40]  If the United States is treated as an individual under Kansas law, it is impossible for such an "individual" to engage in a civil conspiracy with itself.  In light of § 1346(b), the FTCA did not waive sovereign immunity for such a claim. Therefore, the Court finds that none of plaintiff's civil conspiracy claims comes within the

---

[36]28 U.S.C. § 2674; *F.D.I.C.*, 510 U.S. at 478.

[37]*State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1226 (Kan. 1991) (quoting *Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984)).

[38]*Id.* (quoting *Stoldt*, 678 P.2d at 161).

[39]*See* 28 U.S.C. § 2674.

[40]*Id.* § 1346(b).

general waiver of immunity provided in § 1346(b).[41]

Plaintiff argues that the scope of the § 1346(b) waiver should be determined with reference to the respondeat superior theory, but he cites not a single Kansas authority imposing vicarious liability on an employer for a civil conspiracy among its employees while acting within the scope of their employment. Other courts have questioned whether the United States is even capable of engaging in a conspiracy.[42] This Court agrees with the court in *Limone v. United States*,[43] which explained that a civil conspiracy claim is duplicitous when asserted under the FTCA, because a "tort-based civil conspiracy, which requires a predicate tort, is essentially another vehicle for imposing joint and vicarious liability."[44]

Similarly, under Kansas law, "[a] civil conspiracy is not actionable . . . without commission of some wrong giving rise to a tortious cause of action independent of conspiracy."[45] It is a theory "used to impose vicarious liability for concerted action."[46] If a conspiracy is shown, "any act done by a member of the conspiracy in furtherance of the common object and in

---

[41]Perhaps the strongest indicator that the § 1346(b) waiver is limited, is the fact that § 2680(h) excludes intentional torts, while excepting a few specific intentional torts, but only if performed by an investigative or law enforcement officer. *See* 28 U.S.C. § 2680(h).

[42]*See, e.g.*, *Colo. Ins. Group, Inc. v. United States*, 216 F. Supp. 787, 790 (D. Colo. 1963) ("In determining this matter, the Court notes, first, that some doubt has been cast upon the ability of the Government to be engaged in a conspiracy for which an action may be brought under the Federal Tort Claims Act."); *Radford v. United States*, 264 F.2d 709, 710 (5th Cir. 1959) ("the United States is by its nature incapable of entering into the conspiracy charged").

[43]497 F. Supp. 2d 143 (D. Mass. 2007).

[44]*Id.* at 223–24 & n.182.

[45]*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1074 (D. Kan. 2006) (citing *Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984)); *State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1226 (Kan. 1991).

[46]*Ridenhour*, 811 P.2d at 1231.

accordance with the general plan becomes the act of all, and each conspirator is responsible for the act."[47]  Therefore, plaintiff's claim for civil conspiracy to commit assault, battery or excessive force is redundant.

Finally, the FTCA is focused on "act[s] or omission[s]" that are "negligent or wrongful."[48]  This statutory language places "a uniform federal limitation on the types of acts committed by its employees for which the United States has consented to be sued."[49]  The Supreme Court has explained that, "[r]egardless of state law characterization, the Federal Tort Claims Act itself precludes the imposition of liability if there has been no negligence or other form of 'misfeasance or nonfeasance' on the part of the Government."[50]  Under Kansas law, conspiracy is not actionable without an underlying tort.[51]  A conspiracy involves the "meeting of the minds" on a course of action, which, once performed, becomes an actionable wrong. *Conspiracy* to commit a tort, therefore, is not itself an "act or omission" under the FTCA until the underlying tort is performed.  Therefore, under the language of § 1346(b), this Court lacks subject matter jurisdiction under the FTCA to consider plaintiff's civil conspiracy claims.[52]

### ii.      Analogy with a Private Corporation

Defendant also encourages the Court to consider the United States' liability as co-

---

[47]*Vetter v. Morgan*, 913 P.2d 1200, 1206 (Kan. 1995).

[48]28 U.S.C. § 1346(b)(1).

[49]*Laird v. Nelms*, 406 U.S. 797, 799 (1972).

[50]*Id.* (internal citation omitted).  The Tenth Circuit has also explained that "some act of misfeasance or nonfeasance is essential to government liability under the Tort Claims Act, there can be no liability without fault." *Harris v. United States*, 205 F.2d 765, 767 (10th Cir. 1953).

[51]*Diederich v. Yarnevich*, 196 P.3d 411, 419 (Kan. Ct. App. 2008).

[52]*See Sosa v. Alvarez-Machain*, 542 U.S. 692, 707 n.4 (2004) (noting that the FTCA was passed with "garden-variety torts in mind").

extensive with that of a private corporation and argues that Kansas tort law does not recognize conspiracy claims against corporations, municipalities, or their officers because of the intracorporate conspiracy doctrine whereby a corporation cannot conspire with itself. Analogizing the United States liability with that of a private corporation is well-taken. In waiving the United State's sovereign immunity, Congress only opened the government to liability "in the same manner and to the same extent as a private individual under like circumstances,"[53] and only "if a private individual, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[54] Thus, when a private person is not liable for such conduct, neither is the United States under the FTCA.[55] "These provisions, given their plain and natural meaning, make the United States liable to petitioners for the [federal employee's] negligence . . . if, as alleged in the complaints, [state law] would impose liability on *private persons or corporations* under similar circumstances."[56] In 2005, the Supreme Court explained that the court is "to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA."[57] Various courts have adopted the analogy of a private corporation into their FTCA jurisprudence.[58]

---

[53]28 U.S.C. § 2674.

[54]*Id.* § 1346(b)(1).

[55]*See Cox v. United States*, 881 F.2d 893, 895 (10th Cir. 1989) ("Under the FTCA, if a private person would be shielded from liability under the statute, the United States must also be shielded.").

[56]*Rayonier Inc. v. United States*, 352 U.S. 315, 319 (1957) (emphasis added).

[57]*United States v. Olson*, 546 U.S. 43, 46 (2005).

[58]*Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985); *United States v. Inmon*, 205 F.2d 681, 684 (5th Cir. 1953); *Costley v. United States*, 181 F.2d 723, 725 (5th Cir. 1950); *United States v. South Carolina State Highway Dep't*, 171 F.2d 893, 900 (4th Cir. 1949); *Perez v. United States*, 253 F. Supp. 619, 620 (D. Mass. 1966); *Carroll v. United States*, 87 F. Supp. 721, 726 (W.D.S.C. 1949).

Moreover, under Kansas law, the intracorporate conspiracy doctrine holds that "officers and directors of a corporation cannot conspire with themselves when [1] acting on behalf of the corporation and [2] within the scope of their authority"[59] because a "corporate defendant could not be guilty of conspiracy with itself."[60] The only way individual defendants within a corporation might be liable for conspiracy was if "they were pursuing their course as individuals or for individual advantage."[61] Thus, the Court finds plaintiff's civil conspiracy claims are not actionable under the FTCA.

### iii.    Federal Agents Civil Conspiracy with Police Officers

As discussed above, plaintiff failed to administratively exhaust his claims of a civil conspiracy between the federal agents and the police officers. In any event, such a claim is not actionable under the FTCA. The government has waived sovereign immunity only for those torts committed by its own "employee[s],"[62] which includes only "officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty [under specified sections of the Code] . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation . . ."[63] And a "federal

---

[59]*Diederich v. Yarnevich*, 196 P.3d 411, 419 (Kan. Ct. App. 2008).

[60]*Id.* (citing *May v. Santa Fe Trail Transp. Co.*, 370 P.2d 390, 395 (Kan. 1962)); *York v. InTrust Bank, N.A.*, 962 P.2d 405, 422 (Kan. 1998) ("it is true that agents or employees acting only in their official capacities on behalf of a corporate defendant and whose acts are considered those of the corporation may not form a conspiracy with the corporation").

[61]*Diederich*, 196 P.3d at 420.

[62]28 U.S.C. § 1346(b)(1).

[63]28 U.S.C. § 2671.

agency" includes merely "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."[64]  These definitions provide specific limits to the scope of the § 1346(b) waiver.  To construct an overarching conspiracy claim that would subject the United States to liability for the conduct of persons who are not federal employees, would contravene the limited waiver set forth in § 1346(b).

A precondition to imposing liability under the FTCA is that the negligent or wrongful act was performed by a government employee.[65]  The Tenth Circuit has explained how this definition limits federal liability: "the Tort Claims Act contemplates circumstances where there is negligence of a Government employee either by act or omission.  It does not by its terms include liability imposed by other doctrines having their origin in warranties, in product liability, or in absolute liability."[66]  "[L]iability assumed by the United States under the Act is a respondeat superior type of liability."[67]  The United States is not liable for independent contractors under the Act.[68]

For the reasons explained above, the Court has previously found that it lacks subject matter jurisdiction over plaintiff's claim of a civil conspiracy between the federal agents and the

---

[64]*Id.*

[65]*Logue v. United States*, 412 U.S. 521, 526, 532 (1973); LESTER S. JAYSON & HON. ROBERT C. LONGSTRETH, HANDLING FEDERAL TORT CLAIMS, § 9.06 (2009).

[66]*United States v. Page*, 350 F.2d 28, 33 (10th Cir. 1965) (collecting cases).

[67]HANDLING FEDERAL TORT CLAIMS, § 8.04[1].

[68]*See Norton v. Murphy*, 661 F.2d 882, 884 (10th Cir. 1981).

police officers to commit malicious prosecution. Moreover, the Court concludes that this civil conspiracy claim exceeds the scope of the waiver of sovereign immunity in § 1346(b) because it imposes joint and several liability on the United States for the actions of persons who are not "government employees" within the definition of the Act, or persons over whom the federal government exercises direct control.[69] For this reason as well, the Court finds that it lacks subject matter jurisdiction over plaintiff's civil conspiracy claim with respect to the federal agents and the police officers.

**PART II.     Findings of Fact and Conclusions of Law on Federal Tort Claims for assault, battery and excessive force**.

Having dismissed the claims for conspiracy, the Court turns now to the remaining claims of assault, battery and excessive force. Under the Federal Tort Claims Act, 28 U.S.C. 2671, *et seq.*, a plaintiff's claims against the United States are governed by the law of the state where the alleged tortious activity took place.[70] In this case, plaintiff's claims of assault, battery and use of excessive force are governed by the laws of the State of Kansas. Under Kansas law, the elements of an assault claim are: (1) intentionally threatening or attempting to do bodily harm to plaintiff; (2) the actor(s) had the apparent ability to do bodily harm; and (3) as a result of the threat or attempt, plaintiff had an immediate apprehension of imminent bodily harm or offensive contact.[71] Under Kansas law, the elements of a battery claim are: (1) touching or striking

---

[69]*United States v. Orleans*, 425 U.S. 807, 814–15 (1976); *Logue v. United States*, 412 U.S. 521, 527–28 (1973); *see also Limone v. United States*, 271 F. Supp. 2d 345, 364–65 (D. Mass. 2003) (allowing civil conspiracy claim because the court speculated that it was possible "plaintiffs will be able to prove that any number of additional people were functionally agents of the government for FTCA purposes") (citing *Logue*, 412 U.S. at 526–32 (outlining "control" test)).

[70]*Franklin v. United States*, 992 F.2d 1492, 1495 (10th Cir. 1993).

[71]*Vetter v. Morgan*, 913 P.2d 1200, 1203 (Kan. Ct. App. 1995); *see Baska v. Scherzer*, 156 P.3d 617, 622 (Kan. 2007).

plaintiff; (2) the contact was unprivileged; (3) the actor(s) intended to bring about either a contact or an apprehension of contact; and (4) the contact was harmful or offensive.[72]  And, under Kansas law, the elements of a claim of excessive force are:  (1) the actor(s) used force in the course of arresting plaintiff or after his arrest; (2) the actor(s) could not reasonably have believed that the force used was necessary to effect the arrest or to defend himself or another from bodily harm; and (3) as a result of the unreasonable use of force, plaintiff was injured.[73]

The Court heard nineteen days of testimony and reviewed three boxes of exhibits, including documents, photographs, diagrams, and transcripts of trial and deposition testimony. Essentially, these are state law claims, brought under the FTCA, that require the Court to consider these essential questions: (1) did any of the federal agents assault and/or batter plaintiff in the process of arresting and securing him; (2) did any of the federal agents commit excessive force in the process of arresting and securing plaintiff; (3) did plaintiff sustain injuries; (4) what was the nature and extent of injuries sustained; and (5) what are plaintiff's damages.

The parties presented conflicting versions of the events leading up to the collision, traffic stop and arrest of plaintiff, and different versions of what transpired at the scene of the arrest. The parties presented much evidence on questions such as where did the accident occur, and how did the accident occur—did plaintiff intentionally ram his car into McCue's car, or was it an accidental sideswipe?  These questions are not directly germane to the elements of plaintiff's claims, but the answer to these and other questions greatly informs the Court's evaluation of the credibility of McCue and plaintiff, the only eyewitnesses to the actual collision, as well as the

---

[72]*Baska*, 156 P.3d at 622.

[73]*Dauffenbach v. City of Wichita*, 667 P.2d 380, 386–87 (Kan. 1983).

Court's evaluation of the credibility of the three federal agents and other eyewitnesses as their testimony related to all or part of the events surrounding the arrest of plaintiff. While the Court does not wish to belabor the analysis of these tangential issues, since this cases rises and falls substantially on the credibility of McCue, plaintiff, and the other percipient witnesses, the Court will spend some time discussing the evidence. Likewise, although the Court has dismissed plaintiff's claims for conspiracy, the Court nonetheless will discuss some of the evidence pertaining to the conspiracy claims, to the extent that evidence informs and explains the Court's analysis and evaluation of credibility and the issues surrounding the claims of assault, battery and excessive force.

A. **Plaintiff's version of events leading up to the collision, and continuing through his arrest and transport to jail.**

Highly summarized, plaintiff, through his testimony and the testimony of a number of witnesses, contends that the following occurred. On July 10, 2003, plaintiff was driving his Lincoln Continental northbound on Tenth Street in Kansas City, Kansas. Plaintiff was on his way to fill a prescription at a nearby pharmacy for a pain medication prescribed by his dentist after a recent dental procedure. Plaintiff stopped at a stop sign at Tenth and Montana, before proceeding northbound. As plaintiff proceeded, he slowed slightly as he passed his house, on the right side of Tenth Street, then accelerated as he climbed the slight incline of Tenth Street before the intersection of Tenth and Ray Streets. The northbound lane of Tenth Street was a single lane, yet wide enough to accommodate two cars. After plaintiff passed his house and a bus stop area in front of his house, and just south of the intersection of Tenth and Ray, he first noticed a black Monte Carlo on his right side, attempting to illegally pass him on the right side. Having witnessed collisions caused by such illegal passing in this location in plaintiff's neighborhood,

22

plainitff decided to speed up to prevent the car from passing him.  The car nonetheless tried to

pass him, and the cars bumped, resulting in a minor, sideswipe collision.  Plaintiff did not

immediately stop; he traveled a short distance, past the the Ray Street intersection, pulling over

at a place out of the way of car and pedestrian traffic from the neighborhood school.  At some

point, before he stopped, plaintiff  heard a siren, but he did not think it was coming from the car

he collided with, as the black Monte Carlo appeared to be a privately-owned vehicle.

As plaintiff began to alight from his car, he saw the driver of the Monte Carlo rushing

toward him, yelling, with a gun aimed at him.  Shocked by this, plaintiff began to lean back into

his car.  The man, later identified as DEA Special Agent Timothy McCue, grabbed plaintiff and

pulled him out of his car.  McCue and DEA Special Agent Brendan Fitzpatrick then forced

plaintiff onto the pavement.  It was only at this point that plaintiff heard the agents identify

themselves as law enforcement.  McCue and Fitzpatrick attempted to handcuff him.  Plaintiff did

not resist, but he tried to push himself off the blistering hot pavement with his right arm.

Plaintiff was shirtless, and the hot pavement was burning his torso and his face.

By this time, DEA Task Force Officer Brandon Collins joined McCue and Fitzpatrick.

As the three federal agents attempted to handcuff plaintiff's right arm, Fitzpatrick restrained part

of plaintiff's body and Collins put his knees in plaintiff's back.  Despite plaintiff being secured

by the three federal agents, McCue struck plaintiff multiple times, apparently with his closed fist,

as well as with his Glock pistol.  Plaintiff felt the lance of a blow in the back of his head and

believes he lost consciousness briefly.  The three federal agents then raised plaintiff to his feet,

walked him over to the curb, and made him sit on the pavement, behind his own vehicle.  DEA

Task Force Officer Todd Dolato arrived by this time, and plaintiff told Dolato that plaintiff's

head hurt, and that he felt that he might have a concussion. Dolato moved plaintiff to the passenger side of plaintiff's parked car where there was a bit of shade. As plaintiff laid by the side of the car, McCue struck him again, and kicked or stomped him in the head. McCue not only struck plaintiff, he unleashed a string of profane and insulting names, calling him "white trash," and "inbred hillbilly," among other names. When McCue learned that dispatch had just advised that plaintiff had no criminal history or warrants, McCue called plaintiff "system dodging white trash." McCue delivered these words in a loud, threatening voice, and also threatened to kill plaintiff. At some point, plaintiff declared that McCue was fierce to hit someone with handcuffs on, but next time it might be a fight without anyone in handcuffs. McCue remained so agitated, profane and angry, that three of his fellow DEA agents, on three occasions in quick succession, walked McCue away from the scene in an attempt to settle him down.

Kansas City, Kansas Police Detective Robert Lane arrived at some point, and placed plaintiff in his police vehicle. Neither Lane, nor any other agent or police officer ever patted plaintiff down, nor did anyone search his car or his person. Lane assured plaintiff that Lane would try to prevent plaintiff from getting arrested; but that the DEA agents could do whatever they wanted to do. Lane told plaintiff that the incident was a "mess" and a "clusterfuck." Lane later repeated the same assurances and comments to Elisa Bowling, plaintiff's wife. Before leaving the scene, Lane called Elisa Bowling and had her retrieve plaintiff's car from the scene. Other than some photographs taken by DEA agents of the damage to both vehicles, no one at the scene did any examination of the vehicles at the scene.

Task Force Officer Dolato called an ambulance. But plaintiff, observing the camaraderie

and interaction of the fire department paramedics and the agents and officers, was afraid and refused to go in the ambulance. Paramedics determined that plaintiff had stable vital signs, and left the scene.

Plaintiff was taken into custody, transported to jail, and later charged with felony criminal damage to property, for intentionally ramming McCue's car. Plaintiff was also charged with a misdemeanor offense, possession of drug paraphernalia, for a marijuana pipe that plaintiff voluntarily surrendered to Lane while he sat in Lane's police car at the scene.

**B.      Defendant's version of events leading up to the collision, and continuing through his arrest and transport to jail.**

Defendant's version, told largely through the testimony of McCue and to a lesser extent the other agents, diverges from plaintiff's version on some key points: where and how the accident occurred; and when and how McCue struck plaintiff. Highly summarized, defendant's version is as follows. McCue and other DEA agents and task force officers were conducting surveillance the afternoon of July 10, 2003 in Kansas City, Kansas. The agents and officers were driving separately, in unmarked, undercover government-owned vehicles. McCue stopped at the stop sign at Tenth and Montana, either directly behind plaintiff, or to the right of plaintiff's vehicle, as McCue was already manuevering to pass plaintiff on the right side. After making a complete stop at the sign, McCue continued northbound on Tenth Street and attempted to pass plaintiff on the right side of the lane, admittedly an illegal pass. As McCue attempted to pass, plaintiff sped up. As McCue pulled parallel with plaintiff's car, plaintiff looked over at McCue, smiled, and then turned his car sharply into McCue's vehicle, ramming McCue's vehicle, forcing it into the curb and almost causing McCue to hit a utility pole at the bus stop. The collision occurred south of the bus stop, thus between the intersection with Montana street and the bus

stop.  Plaintiff continued driving, despite McCue activating his siren; and plaintiff did not stop but drove for more than a block, until he was north of Ray Street and near the school.   McCue radioed Fitzpatrick, who was south of McCue on Tenth Street, advising that plaintiff had just rammed his vehicle.  Together McCue and Fitzpatrick effected a traffic stop on plaintiff.  As McCue and Fitzpatrick rushed toward plaintiff's stopped vehicle, McCue with his gun drawn, they loudly announced that they were police. Fitzpatrick pulled plaintiff out of his vehicle; and Fitzpatrick and McCue forced plaintiff face down, prone on the pavement.  Soon joined by Collins, they attempted to secure plaintiff, with McCue using his handcuffs.  Plaintiff was shirtless, sweaty and squirming and, despite repeated commands, refused to surrender his right arm so they could handcuff both hands behind his back.  Instead, plaintiff used his right arm to attempt to push himself up from the pavement.  At the same time, Collins had his knees in plaintiff's back; and McCue administered several open hand blows to plaintiff's shoulders and neck, a distraction technique, to obtain control of plaintiff.  McCue admits that he also struck plaintiff with closed fists in the back of his head and on his face, causing plaintiff's black eye.  Once plaintiff was handcuffed, the three agents moved him to sit behind his vehicle.  They never witnessed plaintiff lose consciousness.  Plaintiff made comments about not liking how Latinos were always passing on the right side in that area, near plaintiff's house.  Plaintiff exchanged words with McCue.  Admittedly, McCue called plaintiff "white trash" and other perjoratives.  Admittedly, several officers walked McCue away from plaintiff, to calm McCue down.  But, once plaintiff was secured and seated behind his vehicle, McCue did not strike him again; and McCue never kicked, stomped or used his pistol to strike plaintiff.

     **C.**     **The Court's findings surrounding events leading up to the collision.**

This is a case of road rage.  Plaintiff stopped at Tenth and Montana, and continued northbound, looking over at his house, just north of the intersection of Tenth and Montana, as he passed his house and the bus stop in front of it.  Around this time, in the vicinity of the bus stop, or just north of the bus stop, but before the intersection of Tenth and Ray, McCue attempted to pass plaintiff on the right, even as plaintiff was accelerating.  Plaintiff accelerated because Tenth Street began to go upgrade at that point, but he also accelerated to prevent McCue from passing him.  Plaintiff was irritated; he lived in this block and had seen people making such illegal passes before.  As plaintiff accelerated, McCue accelerated, determined to get around plaintiff's car.  Although McCue was in an unmarked, undercover vehicle, he was at work, conducting surveillance, and likely considered the illegal pass of no consequence as he attempted to perform his official law enforcement duties.  Just as plaintiff was incensed at McCue's attempt to pass him on the right; McCue was incensed at plaintiff's attempt to prevent him from passing on the right.

**D.  The Court's findings concerning the nature and location of the collision.**

The cars collided north of the bus stop and south of the intersection of Tenth and Ray.  McCue's version—that the cars collided south of the bus stop—is not credible.  McCue testified in his deposition and at trial that he stopped at the stop sign.  Fitzpatrick corroborated that McCue stopped at the stop sign.  Given that McCue stopped at the stop sign and that plaintiff was either a full or at least partial car-length ahead of McCue at the time McCue proceeded northbound from a full stop, there simply was not sufficient time or space for McCue's and plaintiff's vehicles to collide at the bus stop.  The bus stop was the equivalent of no more than two or three small city lots north of the intersection of Tenth and Montana.  If one were to

believe McCue's version, in that short distance: (1) his car caught plaintiff's car; (2) his car pulled parallel with plaintiff's car; (3) he observed plaintiff look over and smile at him; and (4) plaintiff rammed his vehicle sharply into McCue's vehicle.

The Court found highly persuasive the testimony of plaintiff's accident reconstruction expert, James Loumiet, who opined that the accident could not physically have taken place in the situs identified by McCue. Loumiet's opinion was rendered on the basis of measurements, acceleration rates of the vehicles and the laws of physics. Defendant's expert, Cline Young, who opined that the accident could have occurred where McCue claimed it occurred, based his opinion on an assumption that McCue did *not* stop at the stop sign. But the evidence is that McCue did in fact stop at the stop sign. Furthermore, defendant's expert gave great credence to photographs taken by Agents Fitzpatrick and McCue, which purport to depict tire treads and skid marks evidencing the situs of the accident. The Court gives no weight to this evidence for several reasons. First, the photographs of the tire treads were not compared to either vehicle and there is no evidence that plaintiff's car or McCue's car left these treads. Second, the tire treads do not tend to show anything about the trajectory of the vehicles that made the tracks.

Furthermore the photographs of the so-called skid marks, which are white streaks and lines on the grey pavement, are entirely unpersuasive and in fact useless. These photographs purport to show a set of tires veering to the right and another set of tires making a sharp swerve parallel to the other set of tire tracks. First, the photographs do not allow the Court to orient these tracks to any particular situs. But, even if the Court accepts the testimony of Agents McCue and Fitzpatrick that these photos were taken near the bus stop on Tenth Street, the Court cannot associate these white streak marks with the vehicles involved. As plaintiff's expert

Loumiet pointed out, these marks cannot be tied to the vehicles, either by tire tread, tire width, or any other objective measure.  More importantly, the Court has examined the many photographs of this stretch of Tenth Street, spanning from the Montana intersection to north of the Ray intersection.  Notably, the surface of Tenth Street is rough, uneven, and replete with many such faded, amorphous white lines and markings.  There is no reason to believe that these particular marks were made by these particular vehicles.  The marks are not apparently fresh, and they are not distinguishable in intensity of color.  They are not the dark marks typically characteristic of skid marks.  They are the same thin, faded, white marks that pervade the surface of this rough surfaced street, as demonstrated by the numerous photographs in evidence.  In short, the photographs cannot be associated with the collision, in time or space and do not inform the Court's determination of where the accident occurred.

As the Court previously mentioned, where the accident occurred is not germane to anything other than the credibility of the parties and witnesses.  As to the situs of the accident, plaintiff's testimony is far more credible than McCue's.  But, it is important to note that even if the Court found McCue's testimony on this point more credible, there are a number of other factual issues in this case in which the Court finds McCue's version not credible.  In other words, even if the Court's determination of where the accident occurred is erroneous, the Court's determination of the respective credibility of the parties in this case would not change.  There is other substantial evidence that points the Court to its ultimate conclusion concerning the credibility of the divergent versions of what happened in the immediate aftermath of the collision.

Another factual issue, also tangential, is whether the collision was an accidental

sideswipe as plaintiff contends, or an intentional ramming as McCue contends. The Court finds, based on the testimony of plaintiff, Fitzpatrick, and McCue, the photographs of the damage to these vehicles and the testimony of the parties' experts, that the collision was an accidental sideswipe. Plaintiff did not intentionally ram McCue's vehicle. Indeed, a jury previously reached the same conclusion, acquitting plaintiff of intentional criminal damage to property. This Court, having heard the testimony of many of the same witnesses, reaches the same conclusion, by a very strong preponderance of the evidence.

The damage to the vehicles was minor. Plaintiff's expert Loumiet and defendant's expert Young agree that this was a sideswipe collision; and both experts testified that there is simply no way to tell from the damage itself whether the collision was caused by an intentional act. The experts depart, however, on one point: defendant's expert Young opined that the damage to the driver's side of McCue's vehicle could have been caused by plaintiff ramming or sharply turning his vehicle into McCue's vehicle. But, Young's opinion is largely influenced by his favorable reception of the photographs taken by McCue and Fitzpatrick of the purported skid marks. The Court finds far more persuasive the well-considered opinion of Loumiet that the damage to the vehicles was the product of a sideswipe, not one vehicle veering into another. Loumiet illustrated to the Court's satisfaction that even a minor veering, at an angle of five to seven degrees, would have caused structural damage to the vehicles; but this collision caused only longitudinal scratches in the paint along most of the length of the vehicles, as well as damage to the wheel well of McCue's vehicle that was likely caused by plaintiff's vehicle, given that plaintiff's vehicle was heavier and had a slightly higher profile. Defendant's expert points to damage to McCue's car: a dent running horizontally along the driver's side door; and a dent in

the driver's door jamb, where the door swings open. But the Court found convincing Loumiet's explanation of this damage to the door jamb area. The sideswipe caused a misalignment that caused the door to push an indentation into that area when the door was opened. As Loumiet ably explained, had that indentation been caused by plaintiff's vehicle ramming into McCue's vehicle, there would have been other damage to the door, and structural damage as well.

The Court views McCue's lack of credibility concerning the nature of the collision as more problematic than his questionable credibility on the location of the collision, although the Court finds his testimony on that point not credible as well. How the collision occurred is more closely related to the issues that are directly germane to the elements of plaintiff's claims. Although the conduct underlying plaintiff's claims did not begin until McCue and Fitzpatrick encountered plaintiff after plaintiff had stopped his car, the defendant partially justifies McCue's conduct based on the alleged nature of the collision. The defendant contends that plaintiff intentionally rammed McCue's vehicle, then did not stop immediately after the accident, all fueling McCue's and Fitzpatrick's perception that plaintiff was resistant to arrest, and justifying their tactics in controlling him as they attempted to arrest and secure him into custody.

But, by all objective evidence, the Court concludes that how the collision occurred is much closer to plaintiff's version than McCue's version. McCue violated a traffic law in passing on the right. Plaintiff had no legal duty to allow McCue to pass. Plaintiff had no duty to slow down, or veer to the left; in fact, had plaintiff veered to the left he risked hitting oncoming traffic. This accident was McCue's fault, although plaintiff did nothing to avoid the accident. This undisputedly enraged McCue; he committed a traffic violation that resulted in a collision and damage to the government-owned vehicle he was driving. This in turn resulted in an

internal affairs investigation by the DEA.  In that light, McCue's rage and anger was not entirely without explanation; he potentially faced disciplinary measures because of the collision and damage.

While the Court does not discredit McCue's testimony on the events occurring after the accident solely on the basis of his lack of credibility on key events leading up to the accident, it is fair to say that the Court is not inclined to give McCue's testimony great weight.  Nonetheless, as the Court further explains below, the Court does not fully accept plaintiff's version of the events after the accident either, but analyzes all of the evidence in determining the totality of what occurred.

**E.      The Court's findings concerning assault and battery of plaintiff and the use of excessive force in arresting plaintiff.**

After the collision, McCue radioed Fitzpatrick and the two of them followed plaintiff's vehicle up Tenth Street, past the Ray Street intersection.  At some point, McCue activated his siren.  Plaintiff finally stopped past the school.  Plaintiff heard the siren but did not associate it with McCue's undercover vehicle.  As plaintiff sat in his vehicle, preparing to get out, McCue and Fitzpatrick rushed toward him, yelling at him to get out of the car.  Running with McCue's gun drawn, they likely announced at least once that they were law enforcement.  Plaintiff saw two men in plainclothes, one with a gun, and may not have heard them say they were police.  An eyewitness, Trevor Trober, watched these unfolding events from the front yard of his grandmother's house, directly across the street.  Trober did not recall hearing the men announce they were police.

In any event, Fitzpatrick or McCue pulled plaintiff out of his car and forced him to the ground.  They laid plaintiff face down, prone on the blistering hot pavement.  It was

approximately 98 degrees at that time. McCue grabbed his handcuffs, and as Fitzpatrick held plaintiff down, McCue grabbed plaintiff's left arm behind his back. McCue was not able to immediately secure plaintiff's right arm; in fact, plaintiff tried to lift his face and torso off the hot pavement by pushing up with his right arm. Fitzpatrick and McCue perceived this as plaintiff resisting. By then, Collins had joined McCue and Fitzpatrick. Collins knelt with his knees in plaintiff's back. Before securing plaintiff's right arm in the handcuffs, McCue hit plaintiff multiple times. McCue may or may not have used pressure point control, or super scapula strikes, a distraction technique applied to the back or shoulders. Collins witnessed McCue hit plaintiff with his closed fist. Collins testified that he was not sure how many times McCue struck plaintiff, but on cross-examination testified that it was two to five times. Notably, McCue admits that he hit plaintiff's face with a closed fist, causing a black eye. McCue also does not deny that his fists may have struck the back of plaintiff's head.

The real question is whether McCue also hit plaintiff with his pistol. At this point in time, the only witnesses on the scene were plaintiff, McCue, Fitzpatrick, Collins, and Trevor Trober. Plaintiff's testimony about being hit with a pistol is equivocal; at one point he testified he was unsure but that it felt like an object other than a closed fist struck the back of his head. At another point plaintiff testified that McCue struck him with the pistol. The Court discounts plaintiff's testimony on this point, as it is possible he was confused, had momentary loss of consciousness, and in any event could not definitively see what hit him in the back of the head. Trober testified that McCue hit plaintiff with his pistol before handcuffing him as well as after plaintiff was handcuffed and laying beside his car. The Court finds that in all likelihood, McCue either struck the back of plaintiff's head with the pistol with relatively minor force, or struck him

with a closed fist with great force.  Had McCue struck plaintiff in the head with great force, it would have created an open wound to his head.  But, as more fully explained below, a closed fist blow to the back of the head, or a blow with a pistol with much less than full force could cause the type of blunt head trauma and closed head injury that plaintiff sustained that day.

McCue then cuffed both arms behind plaintiff's back and the three federal agents lifted plaintiff up and placed him in a seated position behind plaintiff's car.  Next, they moved plaintiff to a reclining position on the side of the car.  The Court believes that from this point on, McCue did not strike plaintiff with his fists or the gun.  The Court believes McCue's gun was holstered.  And, the Court heard no credible evidence that McCue was in a position from which he could have struck the reclining plaintiff with his fists.

But, the Court finds that McCue did kick plaintiff multiple times while plaintiff was reclining by the car.  These kicks may well have landed on plaintiff's skull, the type of force that could also cause the closed head injury that plaintiff sustained.  The Court gives credit to the testimony of Trober that after plaintiff was reclining beside the car, McCue kicked plaintiff several times.  Trober's testimony was corroborated by plaintiff's testimony that McCue kicked him in the head as he lay there.  By this time, Trober was not the only non-law enforcement eyewitness; Trober's mother, Paula Pavlich and grandmother, Brenda Davidson were observing the scene from the front yard across the street.  Their line of sight was partially obstructed; in fact they all testified that they had only a partial view of plaintiff's body.  They could see his legs extending out from the back of his vehicle and they could see part of his torso.  They all testified that they could see McCue swing his foot backward and then forward.  They could tell his foot connected with plaintiff because they could see the visible jolt to plaintiff's body upon impact.

The Court found their testimony credible in this regard. The defendant sought to impeach the credibility of Davidson with a 38-year old conviction for felony welfare fraud, and Pavlich with her felony convictions. The defendant also sought to impeach the credibility of Trober because he did not graduate from high school. Yet there was no evidence from which Trober's intelligence could be questioned, nor was there any evidence that he suffered any cognitive impairment. In any event, the Court considered and weighed the testimony of these eyewitnesses with great care, and found their testimony largely consistent with testimony and other evidence the Court finds to be true. These eyewitnesses were cautious and measured in describing to the Court what each of them saw, as well as what they did not see, and what they inferred from what they were able to see.

Moreover, the actions and statements of Detective Lane tend to corroborate that these eyewitnesses witnessed plaintiff being assaulted and battered, and subjected to excessive force. Detective Lane took the names of these eyewitnesses, but pointedly declined to take their statements. At trial, Lane could only explain that he failed to take their statements for "no particular reason," but further explained that he thought taking the eyewitnesses' statements might "escalate the situation," a remarkable statement that he did not further explain. There was absolutely no evidence that these eyewitnesses were acting out or presenting a problem to law enforcement.

In contrast, Lane told the officer who was later assigned the case, Detective Max Seifert, that the police department needed to "cover" for the DEA agents, because "you know what happened down there."[74] Seifert understood that Lane did not take the statements because he

---

[74]Lane's credibility is weak. He later left the police department, became a public official in another city and was convicted of a felony crime involving public corruption.

was trying to avoid placing his own career at risk or in jeopardy. In contrast, Seifert proceeded to investigate the charge of criminal damage to property, an investigation that necessarily entailed determining whether the collision was intentional. Seifert understood that plaintiff's allegations that the agents had committed assault, battery and excessive force were not unrelated to the charge of criminal damage to property; at the least, the credibility of the complaining witnesses, as well as the motives and intent of plaintiff could not be ignored in investigating the crime. So, Seifert conducted a thorough investigation and, presciently, his career was not only put in jeopardy, he lost his career over *this* case. Seifert was chastised by his managers and ultimately forced out of the police department before he was vested in all retirement benefits. Seifert was shunned, subjected to gossip and defamation by his police colleagues, and treated as a pariah.[75]

In any event, when Detective Seifert interviewed these three eyewitnesses a day or two later, he found them to be pleasant, objective and cooperative. Seifert even tape recorded the statements of these eyewitnesses. Notably, after Seifert turned the tape recording over to his superiors, the tape recording went missing and it has never been recovered. These three eyewitnesses did not exhibit the alleged hostility to law enforcement that Detective Lane claimed

---

[75]Although this evidence largely pertained to plaintiff's conspiracy claims, the Court is compelled to note that the way Seifert was treated was shameful. Seifert was balkanized for crossing the "thin blue line." In all respects the Court found Seifert a credible witness, in fact, of all the witnesses who testified, Seifert was the most credible. He did not ask to be assigned to this case, and in keeping with his characteristic diligence and dedication, which had been noted in past evaluations and even written about in a paper authored by his supervisor, Seifert attempted to fully and objectively investigate this case. Seifert soon determined that there was not even probable cause to charge plaintiff with criminal damage to property. He was castigated by his superiors, by the prosecutor, by the DEA, and upon his forced retirement, he was denied a commission that would allow him to obtain work as a security guard, something police retirees typically rely upon to supplement their limited retirement income. Construing language in an opinion authored by another judge in this Court, law enforcement—even in this trial—attempted to paint a false picture of Seifert and impugn his credibility, even while a string of law enforcement witnesses in this case either testified falsely or through omission, in a way that did not represent the entirety of what the three federal agents did on the day in question.

they had, and the Court found their testimony coherent, credible and objective.[76]

None of the agents corroborated the testimony of these eyewitnesses on McCue's kicking plaintiff while plaintiff was handcuffed and reclining by the car. The agents testified that they were either not there, or did not see McCue kick or strike plaintiff at this point. The Court believes the eyewitnesses and plaintiff. Notably, it is undisputed that throughout this incident, from the time he rushed toward plaintiff's stopped car, until the time that plaintiff was seated in Detective Lane's car, McCue unleashed his anger verbally, calling plaintiff "white trash motherfucker," "system dodging inbred hillbilly," and similar offensive perjoratives. Plaintiff, Trober, Pavlich, and Davidson testified that McCue also threatened to kill plaintiff, something the agents deny. But it is undisputed that Collins, Dolato and Elizabeth DuBois-Marshall, three separate times, "walked" McCue away from plaintiff in an attempt to calm McCue down. Trober, Pavlich, and Davidson described it as the officers pulling McCue away as McCue kicked and flailed at plaintiff. In the Court's view, having focused on the demeanor and words of each witness, the law enforcement witnesses minimized McCue's conduct. But it is telling that they each felt the need to try to physically remove McCue from proximity to plaintiff, as he lay, handcuffed, on the curb beside his car.

When Detective Lane arrived, he placed plaintiff in his car. Notably, despite McCue's allegation that plaintiff had intentionally rammed his car, and the agents' allegations that plaintiff

___

[76]It should be noted that the federal agents and police officers exhibited an attitude, from the outset of this incident, of impuning or, at least, discounting the credibility of the eyewitnesses, and indeed the credibility of plaintiff because the eyewitnesses either had convictions or prior encounters with law enforcement and were not high school graduates. Even while admitting that he called plaintiff "white trash," McCue, as well as the other law enforcement officers involved, inferred that there was no law enforcement reason to investigate plaintiff's claims that McCue caused the accident or that McCue responded by assaulting and battering plaintiff. This arrogance continued during the trial. Indeed the Court sustained plaintiff's objection to a line of questioning about Trober not having graduated high school, after defense counsel argued that someone who has not graduated from high school has questionable credibility.

resisted arrest, none of the agents or police officers patted plaintiff down or searched his person or his car. Apparently there was no genuine concern that plaintiff posed a threat to their safety. As plaintiff sat in Lane's car, Lane assured plaintiff that he would not be charged for what was just an accident. Yet Lane also cautioned that this was a "mess," a "clusterfuck," and that the DEA could do what they wanted. Lane repeated these or similar statements to Paula Pavlich, as well as to Elisa Bowling and Patricia Kalb, plaintiff's criminal defense lawyer. As they sat in his car, Lane asked plaintiff if he had anything on his person, which prompted plaintiff to hand Lane an empty marijuana pipe that was in plaintiff's pocket. This resulted in a misdemeanor charge for possession of drug paraphernalia; and the jury convicted plaintiff of this charge.

At a minimum, the Court finds that McCue struck plaintiff in the face and in the back of the head, with a closed fist and/or with his Glock pistol, with sufficient force to cause a closed head injury, as well as other visible and not visible injuries which the Court will discuss more fully in the following section. McCue struck plaintiff at a time when plaintiff was prone, face down on the hot pavement, but before his right arm was fully secured. McCue struck plaintiff before he was fully handcuffed, but at a time when he and two other agents were restraining plaintiff; Collins had his knees in plaintiff's back while Fitzpatrick was restraining another part of plaintiff's body. The Court further finds that McCue kicked plaintiff several times, while plaintiff was fully handcuffed and laying on the ground. But, even if that Court found that McCue did not strike or kick plaintiff after he was handcuffed and moved to the side of the car, the Court would conclude that McCue acted with excessive force, based on the force he used before plaintiff was fully handcuffed.

Plaintiff and defendant called expert witnesses on excessive force. Each witness had

extensive law enforcement experience, coupled with second-career experience in consulting, teaching, researching or writing about the use of excessive force. The Court need not expend much time comparing the opinions of these experts, for these experts all opined that certain acts constitute excessive force, and this Court finds that some of those acts occurred in this case. Plaintiff's expert Vincent Faggiano, as well as the various agents and police officers, opined that hitting someone with a pistol was excessive force, unless the officer faced imminent threat of death. Defendant's expert, Daniel Breci, was the only witness who opined that hitting someone with a pistol may not be excessive force, but his illustration was a scenario involving imminent threat of death to the law enforcement office. All other law enforcement witnesses, when asked, opined that kicking and stomping someone who is already prone on the ground is excessive force.

While the Court cannot find definitively that McCue hit plaintiff with his pistol, the Court can and does definitively find that McCue hit plaintiff in his face and in the back of his head with a closed fist. McCue admittedly used a closed fist, and also admittedly hit plaintiff behind the neck and ear. Plaintiff's expert Faggiano opined that it is excessive force to apply a closed fist to those areas of the body. Faggiano opined that it is excessive force to strike the back of someone's head, an area vulnerable to head and spinal injuries, which, as Faggiano explained, is why there is a firm rule against such blows in the sport of boxing. The Court wholly rejects the opinions of defendant's expert, Breci. Notably, he was the only law enforcement witness or expert who also opined that McCue broke no traffic laws in making an (illegal) pass on the right. One police officer quoted the precise traffic law that McCue violated. Based on what is undisputed, admitted, or confirmed by the weight of the evidence, the Court

finds that Agent McCue assaulted, battered and acted with excessive force in arresting plaintiff, and to the extent other agents witnessed these acts, they did nothing to stop McCue.

### F.  Court's findings concerning the injury sustained at the scene.

Incredibly, defendant suggested that plaintiff sustained no serious injuries at the scene, and implied that whatever injuries plaintiff presented with at the jail were sustained during his two-day stay at the jail.  But the contusion and blood on plaintiff's face was visible at the scene, according to police officer Ronald Schumaker.  Trevor Trober testified that he saw plaintiff limping at the scene.  And although plaintiff refused the ambulance, he confided to Dolato that he was in pain and felt he might have a concussion.  When plaintiff was transported to the jail that afternoon, he was placed on medical observation at the jail because of his visible injuries and his complaints.

Moreover, although the photographs, taken through a glass window in the jail visitor area, are not the best quality, plaintiff's injuries are quite visible: the contusion on his cheek; swelling on both sides of his head and around his eyes; two black eyes; a large bruise on his back; and a large red bruised area in the back of his head.  Both Seifert, who interviewed plaintiff in the jail, and Elisa Bowling, who visited plaintiff in jail the night of the incident, testified that they observed all of these injuries.  And, Donna McCurry, a nurse practitioner and the Health Services Administrator at the jail, made the same observations of visible injuries, noting that plaintiff had sustained trauma to his head and neck.  Elisa Bowling became concerned about a concussion the night of the arrest when plaintiff described his injuries and his severe headache.  Donna McCurry, who treated plaintiff during the first twenty-four hours, noted that plaintiff had clear thoughts, but blurred vision.  But, as Kevin Pahls, a Kansas City, Kansas

fire department EMT who responded to the scene noted, and as a number of the doctors who testified affirmed, the symptoms of a closed head injury or concussion do not always immediately present themselves.

By the time plaintiff was released from jail, the bruising and black eyes were even more visible, and in visits to two emergency rooms, plaintiff presented with symptoms characteristic of a concussion, according to the neurologist and other physicians who testified in this case. In addition to the visible injuries, the emergency room personnel recorded plaintiff's complaints of pain, memory loss, dizziness, confusion, nausea and seizures. Released to go home, plaintiff went to another emergency room the next day; Elisa Bowling told medical providers there that plaintiff was mumbling, stumbling and not acting like himself. The hospital advised plaintiff to see a neurologist.

Plaintiff went to Dr. James Appelbaum, a neurologist. Notably, Dr. Appelbaum testified that one month after the incident, plaintiff *still had visible injuries*, swelling and bruising on both sides of his head and face, most markedly around his left eye. Dr. Appelbaum testified that the presence of swelling and bruising this long after the incident was indicative of a major trauma and severe injury. In fact, Dr. Appelbaum testified that plaintiff sustained two discrete head injuries: from the blows to the back of his head, and from the front of his head hitting the pavement. The visible contusions, bruising and swelling were consistent with these dual injuries.

### G. Court's findings about the severity and persistence of plaintiff's injuries.

The great weight of the evidence establishes that plaintiff sustained a concussion, which developed into post-concussion syndrome and Post-Traumatic Stress Disorder ("PTSD"). The attack has left plaintiff, the family breadwinner and father of four, with substantial physical and

emotional impairments.  Since the arrest, he has suffered from a myriad of physical and mental symptoms and problems, including disabling migraine headaches almost daily, dizziness, hearing loss, constant tinnitus (ringing in his ears), problems with balance and stumbling, nausea (especially when working in the heat), flashbacks, insomnia, nightmares, panic attacks, depression, suicidal ideation and one incident of attempted suicide.  These symptoms and problems were described in great detail by a number of witnesses, including: plaintiff; Elisa Bowling; plaintiff's criminal defense attorney; plaintiff's in-laws; a number of plaintiff's friends; a number of plaintiff's former co-workers, some who were friends of plaintiff, some who were not; plaintiff's former construction crew supervisor; as well as plaintiff's physicians, psychologist and counselor.  The testimony of these various percipient witnesses was consistent and painted for the Court a picture of plaintiff's life before the incident and the profound suffering and impairment he has suffered as a consequence of the assault, battery and excessive use of force upon him.

Plaintiff has been diagnosed with post-concussion syndrome and PTSD.  His treating physicians, psychologist and licensed clinical social worker all agree that, although some concussions resolve without long-term effects, some people such as plaintiff suffer concussions that persist, for months, years, even the rest of their lives.  Although his treating providers have seen improvement in some symptoms over the years, plaintiff's concussion and PTSD have persisted seven years.  His treating providers agree that his prognosis is guarded; in all likelihood, these symptoms will continue to persist without any further improvement.

The treating providers also agree that plaintiff's conditions are the product of "blunt force trauma" and significantly limit his ability to work in his craft as a construction worker and

laborer.  Plaintiff has extreme difficulty working in the heat, and also has difficulty working on scaffolding or at elevated locations because of problems with his balance.  Light has such an adverse effect on plaintiff that his neurologist prescribed dark tint on his car windows exceeding the degree of tint otherwise allowable under the law in Kansas.  He has repeatedly become ill with nausea at work and has vomited in front of co-workers.  He suffers from excruciating migraine headaches and suffers bouts of disabling fear and panic attacks.  Plaintiff's future income potential is significantly impaired.  Linda Divine, a licensed clinical social worker who has worked with plaintiff on vocational possibilities, testified that with plaintiff's lifelong learning disabilities, and his work experience being limited to construction and other manual labor, his possibility of securing work that does not involve heavy labor or outside labor is limited.

During the course of this trial, the stress and fear plaintiff suffered from being in close proximity to McCue and the other agents, necessitated multiple breaks for plaintiff to gather his composure or flee to the restroom.  Not surprisingly, his continuing injuries have strained his relationship with his wife, children and other family members, financially and emotionally. Patricia Kalb saw plaintiff soon thereafter and throughout the course of representing him in his criminal case, and noted that he had debilitating headaches, anxiety, and panic attacks, necessitating her request for a continuance.  Elisa Bowling and other family and friends described plaintiff's socially and physically active lifestyle before the incident and his reclusive existence now.  He is unable to engage in his beloved outdoor activities because heat-induced migraines and nausea substantially limit or preclude those activities.

Defendant argues that plaintiff's symptoms are subjective and that he is a malingerer.

Although many of the symptoms are based on plaintiff's subjective complaints, the Court heard evidence not just from plaintiff and his friends and family, but evidence from former co-workers, some of whom had no close relationship with plaintiff. The Court finds no reason to disbelieve the consistent accounts of plaintiff's severe symptoms and impairments. Defendant points to a battery of neuropsychological testing performed by defendant's expert Lyle Baade who opined, based on plaintiff's performance on several tests, and in particular his performance on the so-called "fake bad" scale of a certain test, that plaintiff was a malingerer. Although Baade's opinion was based on a test that is accepted in the field as evidence of malingering, there were a number of other tests, administered by Baade as well as plaintiff's expert, Richard Wetzel, that did not show any signs of malingering or manipulation. Furthermore, the Court discounts Baade's opinion because Baade refused to take into account that plaintiff had a migraine during one day of testing and further failed to account for the fact that plaintiff has never performed well on tests because of his lifelong learning impairments.

Moreover, neither Baade nor any other expert could refute the objective findings of Dr. Gregory Ator, an otolaryngologist, that plaintiff had suffered significant hearing loss in his left ear, and that this type of asymmetrical hearing loss was due to a trauma, not age or exposure to loud noises or music. The significant hearing loss in the left ear, coupled with the evidence of more trauma to the left side of plaintiff's head and his left eye, are all consistent with the Court's finding that McCue did in fact hit and kick plaintiff in his head.

Plaintiff's construction skills and work ethic have been fruitful, as he primarily or single-handedly rehabilitated two houses that he and his wife resided in over the years. But after the incident, plaintiff has not been able to work on such home projects. Nor has he ever been able to

44

perform duties essential to construction work for more than fifteen days a month. Plaintiff is not malingering; he has tried to work, repeatedly. The Court heard evidence from former employers who described plaintiff's strong work ethic and valiant efforts to work even when he was sick. These employers noted that it was often their decision to send plaintiff home, not plaintiff's decision, for his impaired efforts were placing a burden on the other members of the construction crew.

**H.     Court's findings concerning plaintiff's damages.**

Plaintiff presented extensive evidence on his damages incurred to date and his projected future damages. The Court has reviewed the documents provided as well as the testimony and is prepared to assess damages. At the close of the evidence, in the interests of time, the Court advised counsel that the Court would call upon them to present closing arguments in writing at a later time, and in particular after the Court decided defendant's motion to dismiss, which might narrow the claims in this case. Thus, the Court has not had the benefit of the parties' closing arguments, but based on the extensive evidence admitted in this case, the Court is prepared to assess damages, understanding the itemization of damages that plaintiff seeks, as spelled out in the Pretrial Order, as well as in plaintiff's proposed findings of fact and conclusions of law.

Plaintiff seeks punitive damages of $50,000,000. But under the FTCA, the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."[77] Thus, plaintiff is not entitled to punitive damages.

With respect to compensatory damages, under the FTCA, damages are determined by the

---

[77]28 U.S.C. § 2674.

law of the state where the tortious act was committed,[78] and presumes the application of any relevant damage caps that might be applied in the case of a private individual under like circumstances.[79]  Plaintiff seeks  damages of $5,000,000 for "pain, suffering, humiliation, loss of enjoyment, loss of function and physical disfigurement," according to the Pretrial Order.  Under Kansas law, these damages are "noneconomic loss,"[80] and subject to  K.S.A. § 60-19a02, which caps such noneconomic damages at $250,000 in any action seeking damages for personal injury or death.[81]  Specifically, in any action for personal injury, "the total amount recoverable by each party from all defendants for all claims for noneconomic loss shall not exceed a sum total of $250,000."[82]  This is an action in which plaintiff seeks damages caused by assault, battery and excessive force, and this action is within the purview of the statutory cap, because the cap applies to all actions based on personal injury, not just negligence actions.[83]  Moreover, the cap applies to all noneconomic damages, including both past and future noneconomic damages, collectively.[84]  Thus, plaintiff is entitled to no more than $250,000 in past and future

---

[78]*See also Hatahley v. United States*, 351 U.S. 173, 182 (1956).

[79]*Haceesa v. United States*, 309 F.3d 722, 726 (10th Cir. 2002); *Hill v. United States*, 81 F.3d 118, 120-21 (10th Cir. 1996).

[80]*Cott v. Peppermint Twist Mgmt. Co., Inc.,* 856 P.2d 906, 933 (Kan. 1993).

[81]K.S.A. § 60-19a02(b).

[82]*Id.*

[83]*Cott,* 856 P.2d at  933–34.

[84]*Id.* at 913 ($1,040,000 to Cindy for past and future pain and suffering, including mental anguish and disfigurement; $570,000 to John for past and future pain and suffering, including mental anguish and disfigurement, which the trial court reduced to $250,000 for Cindy and John each); *Wagner v. SFX Motor Sports*, Inc., 522 F. Supp. 2d 1330, 1345–46 (D. Kan. 2007), *reversed on other grounds*, 586 F.3d 1237 (10th Cir. 2009) (district court applied $250,000 statutory cap to all noneconomic damages combined, both past and future); *Linnstaedter v. McFarland*, No. 03-CV-2107, 2004 WL 3592865 (Kan. Dist. Ct. Oct. 29, 2004) (reducing past and future noneconomic loss to $250,000 for each plaintiff); *see Wardrip v. Hart*, 934 F. Supp. 1282, 1285 (D. Kan. 1996).

noneconomic damages.

The Court finds that as a consequence of the injuries plaintiff sustained in this matter, he has incurred past damages, comprising: (1) medical bills ($17,000); (2) lost wages ($45,000); (3) mileage ($250); (4) property damage to his vehicle ($400); (5) cost of window tinting to his vehicle ($200); (5) loss of ability to perform certain household repairs ($10,000); (6) child care costs arising from inability to perform those duties ($20,000); (7) pain, suffering, humiliation and loss of function (non-economic damages of $100,000).

The Court further finds that as a consequence of the injuries plaintiff sustained in this matter, he will incur future damages. Plaintiff is 36 years old and the Court assumes a life expectancy of 77 years, and a wage-producing work expectancy of 30 years, based on the evidence presented on this issue. His future damages comprise: (1) projected medical expenses ($220,000); (2) projected lost wages ($200,000 based on 60 days of lost income a year for 30 years); (3) projected expenses arising from inability to perform certain household repairs for 44 years ($41,000); (4) projected expenses arising from inability to perform child care ($20,000); (5) projected mileage for doctor's appointments ($5000); (6) future window-tinting cost ($4400); (7) pain, suffering, humiliation and loss of function (non-economic damages of $150,000). Thus, plaintiff's total damages, past and future are **$833,250**.

**PART III.      Conclusion and Order**

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant United States of America's Motion to Dismiss All of Plaintiff's Claims Except Assault Based on Lack of Subject Matter Jurisdiction, and Motion for Judgment as a Matter of Law Based on Plaintiff's Failure to Satisfy His Burden of Proof on Various Claims with Memorandum in Support Included (Doc.

386) is **granted in part and denied in part.** The Court dismisses all of plaintiff's civil conspiracy claims asserted via the Federal Tort Claims Act for lack of subject matter jurisdiction. The Court denies the motion for judgment on plaintiff's claims of assault, battery and excessive force.

**IT IS FURTHER ORDERED** that the Court further will grant judgment to plaintiff in the amount of **$833,250.**

**IT IS ALSO ORDERED** that the Court will award post-judgment interest pursuant to 28 U.S.C. § 1961.

**IT IS SO ORDERED.**

Dated: September 17, 2010

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE